THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
JOSEPH BERINGER, Defendant-Appellant.

First District (1st Division)   No. 83—1327

Opinion filed January 5, 1987.

James J. Doherty, Public Defender, of Chicago (Emily Eisner, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Joan S. Cherry, Peter D. Fischer, and Craig M. Antas, Assistant State's Attorneys, of counsel), for the People.

JUSTICE BUCKLEY delivered the opinion of the court:

After a jury trial, the defendant, Joseph Beringer, was convicted of murder (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(a)) and conspiracy (Ill. Rev. Stat. 1983, ch. 38, par. 8—2(a)) in the shooting death of Joanne Barkauskas. This case is a companion case to *People v. Barkauskas* (1986), 147 Ill. App. 3d 360, 497 N.E.2d 1183, where the victim's husband was convicted of murder, armed violence, solicitation, and conspiracy. The defendant in that case was sentenced to natural life in prison without parole.

The facts of the Beringer case are essentially the same as *Barkauskas*. Edward Barkauskas, the victim's husband, approached James Galason with a proposition to kill his wife in exchange for part of the insurance proceeds. Barkauskas asked Galason to shoot his wife below the neck so there could be an open casket funeral. Galason, the defendant, and his brother, who was a codefendant, planned the murder, which was committed on July 16, 1981.

The State called for a death sentence hearing. At this hearing, the judge exercised mercy and sentenced the defendant to natural life in prison without parole for his role as the shooter in a cold-blooded contract murder.

On appeal, the defendant raises a multitude of errors ranging from erroneous rulings on the admissibility of evidence to gross misconduct by the prosecutors. For the following reasons, we reverse the verdict of the trial court and remand the case for a new trial.

I

Defendant argues that the State's cross-examination for Harvey Webb, the only eyewitness to the murder, denied him a fair trial. Webb witnessed the murder while he was walking to his job as a car wash attendant. He knew the victim by sight, having seen her walk down the street on several occasions. Otherwise, Webb had no connection with the events of the crime.

Webb testified that he was able to identify the car that was used at the scene of the crime. He further testified that later at the police station, he picked James Galason out of a lineup as the shooter. Webb was able to identify Galason by his characteristically long blonde hair that was blowing in the wind from the fatal shotgun blast.

The two State's Attorneys who cross-examined Webb asked unsubstantiated questions for the purpose of attacking him personally. Generally, the questions insinuated that Webb solicited money for his testimony, that he used drugs before he spoke to the State's Attor-

ney, and that he conspired with defense counsel to change his testimony because he blamed the police for the fact that he lost his job at the car wash. In particular, Webb was cross-examined as follows:

"Q. Didn't you call me and tell me you were locked up on a disorderly?

A. No, sir.

Q. And you wanted me to get you out of jail?

A. No, sir.

Q. Didn't you tell me that?

A. No, sir.

Q. And that you would come in this court if I paid you money, didn't you tell me that?

A. No, sir.

Q. And you would say anything—

MR. STAMOS: If I may make an objection, inserting himself in this case as a witness. It is improper for him to be asking these forms of questions, get on the stand and testify.

THE COURT: You will have to perfect your impeachment.

MR. WADAS: I understand that.

Q. Didn't you tell me, Mr. Webb, if I scratch your back you will scratch my back, didn't you tell me that?

A. No, sir.

* * *

Q. How much did you have to drink before you came to our office that morning?

MS. PLACEK: Objection.

THE COURT: Overruled. I will sustain the form, as to the form.

MR. WADAS:

Q. Had you been drinking that morning?

A. A glass of orange juice.

Q. Had you been drinking any alcoholic beverages?

A. I had not been out of the house.

Q. How much of any reefer did you smoke that morning?

MS. PLACEK: Objection.

MR. WADAS:

Q. Did you take any drugs or smoke any reefer that morning?

A. I don't mess with it.

Q. You don't mess with reefer?

A. No.

* * *

Q. Didn't you tell us, Mr. Webb, you didn't remember anything about the case and you didn't want to remember anything about the case, didn't you say that?

A. No, sir.

Q. Didn't you ask us how much money we were going to pay you to come into court?

A. No, sir.

Q. You didn't ask us for money to testify?

A. I didn't ask for anything.

Q. Told us what you wanted to say, if we paid you money?

A. I ask [sic] you for a cigarette.

\* \* \*

Q. Didn't Ms. Placek tell you now remember Harvey put it on the police and the State's Attorney you lost your job because of the police—

MS. PLACEK: I am going to object to that and it is a personal attack against me.

THE COURT: Be seated. The jury will disregard that.

MR. WADAS:

Q. Did Marijane Placek say that to you or not?

A. No, sir.

Q. She didn't tell you remember to put it on the police that is the reason why you lost your job?

A. No, sir.

Q. You had no conversation with her?

A. No, sir."

This unsubstantiated cross-examination destroyed Harvey Webb's credibility before the jury. None of these questions had any factual foundation. On at least one occasion the judge reminded the prosecutor that he would have to perfect his impeachment, he responded "I understand that," but never did. This conduct violates *People v. Nuccio* (1969), 43 Ill. 2d 375, 381, 253 N.E.2d 353, 356, where the Illinois Supreme Court stated:

"The impropriety of the cross-examination does not rest simply upon unsupported insinuations of misconduct, but also upon the State's failure to present appropriate rebuttal testimony in response to the defense witnesses' specific denials of misconduct \* \* \*." 43 Ill. 2d 375, 381, 253 N.E.2d 353.

The State responds to this *Nuccio* violation by arguing that "[i]n order for the failure to complete impeachment to rise to the level of reversible error, the unfounded insinuation that the witness is unbelievable or is lying must be substantial, repeated, and definitely prej-

udicial." (*People v. Redman* (1985), 135 Ill. App. 3d 534, 542, 481 N.E.2d 1272, 1278.) The State's reliance on *Redman* is misplaced because this case fits squarely within its rule. First, the "unfounded insinuation" was "substantial" because the prosecutors implied that Webb twice suborned perjury, used drugs, and conspired to change his testimony. Second, the objectionable questions were "repeated" occurring at no less than four separate points during cross-examination. Third, the questions prejudiced defendant because after the eyewitness Webb was impeached, the uncontroverted evidence indicated that the defendant was the shooter, a fact the judge specifically relied upon in his sentence of natural life without parole.

■ The State's cross-examination also impugned the integrity of defense counsel, further prejudicing defendant. Such conduct has been consistently condemned. (See *People v. Starks* (1983), 116 Ill. App. 3d 384, 394, 451 N.E.2d 1298, 1305 (cases cited therein).) Moreover, the prejudice that accrued to defendant could not be cured by the court's instructions because the prosecutor repeated the prejudicial question after objection had been sustained and the jury instructed to disregard it. Thus, the unperfected cross-examination constituted reversible error.

## II

Defendant assigns error to the following closing argument remarks by the prosecutor:

> "What about Joanne Barkauskas' rights. I want to mention her rights and talk to you about that because she can't be here today to speak up for herself. What about her right to grow old, to have a family. Her rights are never considered in this case, not one word has been mentioned about Joanne Barkauskas' rights.
>
>     * * *
>
> I'm not asking you to convict on * * * [sympathy], my client who didn't have a lawyer before she was destroyed; who didn't have a jury trial before she was taken out.
>
>     * * *
>
> And what do you think—don't you think the lawyers were helping each other out a little, too? Mr. Stamos and Miss Placek, you noticed how they cross-examined all the witnesses in this case.
>
> Did you notice how Mr. Stamos cross-examined Joey, not Mr. Beringer, Joey.
>
> You noticed how Miss Placek cross-examined Kenny, not her

client, Kenny.

Very kind. Something I thought Miss Placek was incapable, kindness; but she displayed it to Kenny Beringer.

I thought she was incapable of courtesy to other people; but she displayed courtesy to Kenny Beringer because they are trying to help each other out. They start with the common ground of attacking Jimmy Galason."

Defendant argues that the above comments constituted an improper appeal for sympathy for the deceased and her family, "an insidious cry for vengeance," and a further attack on defense counsel. The State counterargues that these statements were taken out of context. In addition, the State argues that these statements did not arouse the jury's passions and sympathies because it explicitly reminded the jury not to decide the case based on sympathy.

The State's arguments are unpersuasive. A careful review of the record indicates that these statements were not taken out of context. Indeed, reading the closing argument as a whole reveals other similar examples of statements designed to arouse the jury's passions. Moreover the second paragraph above amply demonstrates how the State "reminded" the jury not to convict based on sympathy. First, it implored the jury not to be swayed by sympathy for the victim, but in the same breath it played on the passions and emotions of the jury. An isolated reminder that sympathy should not play a role in the jury's decision making is wholly ineffective when the State has persistently aroused the jury's passions.

■ The remarks in the first excerpted paragraph, about Joanne Barkauskas' rights and her family's rights, are strikingly similar to those found to be prejudicial in *People v. Littlejohn* (1986), 144 Ill. App. 3d 813, 827, 494 N.E.2d 677, 686-87, and *People v. Starks* (1983), 116 Ill. App. 3d 384, 390, 451 N.E.2d 1298, 1302-03. For example, *Starks* found the following statements prejudicial: " '[defendant] took away his [the deceased's] right to get married, his right to have a happy life, his right to finish school and maybe get a better job, his right to children if he wanted, his right to buy a house.' " (116 Ill. App. 3d 384, 390, 451 N.E.2d 1298.) Both *Starks* and *Littlejohn* held that actual prejudice accrued to the defendant as a result of such argument. Similarly, we find in this case that the commentary about Joanne Barkauskas' rights and her family's rights was designed to arouse the sympathy and passions of the jurors and thus was improper.

As demonstrated by the third set of excerpted paragraphs above, the State continued its attack on defense counsel that it began dur-

ing the cross-examination of Harvey Webb. Accusations of deceptions between the defense counsels and personal attacks on defendant's attorney served no purpose except to prejudice the jury. (*People v. Suggs* (1977), 50 Ill. App. 3d 778, 783, 365 N.E.2d 1118, 1121.) In light of the earlier attacks, these remarks during closing argument seem designed to finish the disparagement of defense counsel's integrity.

To summarize, we find that the State's conduct in this case was so egregious as to deny defendant a fair trial. The State used unsupported cross-examination to destroy a key defense witness and impugn the integrity of defense counsel. Further, during closing argument it aroused the jury's passions with vengeful commentary and completed its personal attacks on defense counsel.

A heinous crime was committed in this case. Certainly the responsible parties should be punished, but only after a fair trial. The State's brazen misconduct insured that the defendant would not receive a fair trial. Accordingly, the judgment of the circuit court is reversed and the cause is remanded for a new trial. We expect that the errors discussed herein will not be repeated on retrial.

Our disposition makes it unnecessary for us to consider the remaining issues raised by defendant on appeal. We note, however, that we believe the evidence at trial was sufficient for the trier of fact to conclude that defendant was guilty beyond a reasonable doubt. This does not mean we are making a finding as to defendant's guilt or innocence which would be binding on retrial, but rather our consideration of the sufficiency of the evidence admitted at trial will remove the risk of subjecting defendant to double jeopardy. See *People v. Taylor* (1979), 76 Ill. 2d 289, 309, 391 N.E.2d 366, 375.

Reversed and remanded.

CAMPBELL and O'CONNOR, JJ., concur.