THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
JOSEPH A. WARD, Defendant-Appellant.

Second District   No. 2—88—0442

Opinion filed December 20, 1989.

Josette Skelnik and Mary Robinson, both of Robinson & Skelnik, of Elgin, for appellant.

Gary V. Johnson, State's Attorney, of Geneva (William L. Browers and Colleen M. Griffin, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE WOODWARD delivered the opinion of the court:

Following a jury trial, the defendant, Joseph A. Ward, was found guilty of the offense of residential burglary and sentenced to serve a term of seven years in the Department of Corrections. Defendant appeals, contending that he was denied a fair trial by the admission into evidence at trial of plea-related discussions he initiated with the police and by remarks by the prosecutor insinuating that the defendant's alibi witness had been paid to testify.

The testimony at trial revealed the following facts. On June 2, 1987, at approximately 4:17 a.m., a man made an unauthorized entry to the home of Stewart and Karen Gilbert and removed property belonging to John O'Connor, who was living with the Gilberts. Karen Gilbert, who had been asleep on the living room couch and who was awakened by the unauthorized entry, described the intruder as having blond hair to his shoulders, medium build, and wearing blue jeans but no shirt. Earlier in the evening she had observed a man matching

that description staring at her from outside her home. As the intruder went through the Gilbert residence, Karen was able to observe the sides of the man's face for a few seconds. After the man exited the residence, the police were called, and Karen gave them the above description. Karen admitted that right after the incident, she told the police that she had kept her eyes closed when the front door opened.

Defendant was apprehended a short time later and brought to a nearby gas station to be viewed by Mrs. Gilbert. Although she was fairly positive that the defendant was the man she saw in her home, she wanted to wait to be sure. Defendant agreed to be taken to the police station to be photographed and fingerprinted. He was then released.

On June 3, 1987, after viewing a photographic lineup for approximately 15 seconds, Mrs. Gilbert selected the defendant's photograph as a picture of the individual who had been in her home the early morning hours of June 2, 1987.

On June 20, 1987, defendant was arrested and charged with the residential burglary of the Gilbert residence on June 2, 1987. Defendant was questioned by Detective T.J. Strickland, who advised him of his *Miranda* rights and explained that he wished to question him about the residential burglary charge. Defendant responded that he had been at the Walnut Tap when the burglary occurred. Strickland asked the defendant how he knew what time the burglary occurred, to which the defendant responded that he assumed it occurred at night and that he had been at the Walnut Tap between the hours of 11 p.m. and 12:30 a.m. Defendant denied being in the area of the Gilbert residence. When Strickland told defendant that Mrs. Gilbert had been sleeping on the couch and had identified him, defendant told Strickland that he knew a lot of narcotics dealers in Elgin and would like "to work this off." Strickland told the defendant that the police could not make any deals, and the only thing he could do was to tell the State's Attorney that the defendant had cooperated. Defendant admitted that he made the statement because he wanted to go home.

Defendant's alibi witness was Glen Negler. According to Negler, he was with the defendant at Wiese's Boulevard Tap until approximately 4:30 a.m. on June 2, 1987. The bar was only open till 4 a.m. but it took them a while to get out of the parking lot. After leaving the bar, Negler dropped the defendant off by a baseball field.

On cross-examination, Negler was asked when he was first approached about being a witness for the defendant and by whom. He explained that he had first been contacted by Rick Stahl, an investigator for the public defender's office on March 3, 1988, a few days prior

to trial. On that same day, Negler also spoke with the prosecutor and Detective Strickland. Negler could not remember being asked how he happened to remember the events of June 1, 1987, or telling the prosecutor and Strickland that Rick Stahl had told him about the events of that night. After he testified that no one had contacted him about the case prior to March 3, 1988, the prosecutor asked, "Mr. Negler, how much are you getting paid to testify?" The trial court sustained an objection to the question, and the parties went into chambers for a conference regarding the matter.

During the conference, the prosecutor indicated that during her interview with Negler, he had told Detective Strickland and her that he was getting paid for testifying and asked them how he was supposed to be paid. The prosecutor contended that those comments showed a bias or interest on the part of the witness in favor of the defendant.

The parties returned to the courtroom, and the trial judge ordered the prior question of the prosecutor stricken, and the jury was instructed to disregard it. Negler was then further cross-examined by the prosecutor as follows:

"Q. Mr. Negler, isn't it a fact that on March 3 of 1988 at approximately 5:40 p. m. while Detective Strickland and I were interviewing you, you asked us how you were supposed to get paid for testifying?

A. No.

Q. You never asked how you were getting paid?

A. No.

Q. Did you—.

A. I figured on my own from what I know from a subpoena you would get an amount of money for showing up from the court, but I did not ask you that question.

Q. Didn't you ask or didn't you tell Detective Strickland and me that you were told that you would get paid $15 to come and testify today?

A. I knew that on my own. I don't know the exact amount, but I know myself how much you get, somewhere in that range.

* * *

Q. Did you tell Detective Strickland and me something along the lines of getting paid for testifying for coming to save Joe's hide, or words to that effect?

A. No, not that I recall.

Q. Mr. Negler, you just said no, not that I recall. Does that

mean you didn't say it or does that mean you didn't recall saying it?

A. No, no, no.

THE COURT: All right. Which, sir? You don't recall or you didn't say it?

THE WITNESS: No, nothing. I didn't say nothing.

THE COURT: I'm still not sure of your answer. Is your answer that you did not say that or you don't recall saying that?

THE WITNESS: I don't recall saying that to her.

THE COURT: All right. Thank you.

Q. [By Ms. Cavins, assistant State's Attorney]: So you may have said it?

A. No. I don't recall saying that to you personally.

Q. Do you recall saying anything at all to Detective Strickland and me about getting paid as a witness?

A. No.

Q. Does that mean you don't recall or you didn't say that?

A. I don't recall saying that to you.

Q. So you might have said it?

A. No. I don't recall saying it to you.

Q. Does that mean you didn't say it?

THE COURT: It means if he did say it, he doesn't recall."

According to the defendant, he had been at the Elgin boat launch with friends, Laura Lombardo and Bill Craft, when he decided to buy more beer. He got a ride to a liquor store from Glen Negler whom he saw driving by in his van. Due to the lateness of the hour, all the liquor stores were closed, so defendant and Negler went to Wiese's Boulevard Tap, which was open until 4 a.m. They stayed there until closing, after which Glen dropped him off at the road leading to the boat launch. As he walked toward where his friends were, he saw a police officer talking to Laura and Bill. He was just standing in the weeds listening to the conversation when he made a noise. The officer saw him and yelled at him, at which point defendant ran. Defendant explained that he ran because he had some marijuana in his pocket. He was apprehended and taken to the gas station to be viewed by Karen Gilbert. Defendant denied entering the Gilbert residence on the morning of June 2, 1987.

On rebuttal, Detective Strickland testified that at the end of the interview on March 3, 1988, Negler asked him when he would get his money. Negler stated that he expected to get $15 and told Strickland that he had been given that figure from Rick at the public defender's office. In addition, however, Negler also told Strickland that "Joe

Ward better pay him for saving his ass this time." Strickland acknowledged that witnesses who are subpoenaed to court do receive compensation of approximately $15 for the time spent in court.

On surrebuttal, Rick Stahl testified that on March 2 or 3, 1988, he served Glen Negler with a subpoena, advising him that he was needed to testify on behalf of the defendant. Negler told him that if his court appearance necessitated that he miss work, he would have to be paid for testifying. Stahl told Negler that he would receive approximately $15 in transportation fees but that the public defender's office could not pay a witness to testify.

During the State's closing argument, the prosecutor stated as follows:

> "And when Detective Strickland, after talking for a while, finally says Karen Gilbert wasn't asleep, she saw you as you walked by that couch, she identified you, what does he do? What does he do? He slumps, the head goes down. He says let's make a deal. Let me work this through. I know drug dealers. Let's make a deal, ladies and gentlemen. Make a deal for what? His instinctive reaction when he knew he was caught was to try and make a deal."

Later, in rebuttal argument, the prosecutor stated:

> "I submit, ladies and gentlemen, if you didn't commit the offense, you would not jump at the point where you've been told you were identified and say, hey, let's make a deal. No. You'd say she's wrong, something along those lines, but not let's make a deal, let me work this off, I know some drug dealers.
>
> Ladies and gentlemen, I'm going to ask you again when you retire to return a verdict of guilty and tell Joseph Ward no deals."

The jury returned a verdict finding the defendant guilty of residential burglary, and the trial court sentenced him to seven years in the Department of Corrections. This appeal followed.

■ Defendant contends, first, that he was deprived of a fair trial by the admission of Detective Strickland's testimony that after defendant had been informed that he had been identified by Karen Gilbert, he told Strickland that he knew quite a few narcotics dealers in the Elgin area and he would like to "work this off." Defendant argues that his statement constituted a plea-related discussion and is thus protected by Supreme Court Rule 402(f) (107 Ill. 2d R. 402(f)), which prohibits the admission into evidence of plea-related discussions. Supreme Court Rule 402(f) provides in pertinent part as follows:

"If a plea discussion does not result in a plea of guilty, or if a plea of guilty is not accepted or is withdrawn, or if judgment on a plea of guilty is reversed on direct or collateral review, neither the plea discussion nor any resulting agreement, plea, or judgment shall be admissible against the defendant in any criminal proceeding." (107 Ill. 2d R. 402(f).)

The purpose of this rule is to encourage the negotiated disposition of criminal cases through elimination of the risk that the accused enter plea discussions at his peril. (*People v. Friedman* (1980), 79 Ill. 2d 341, 351.) A determination as to whether a statement is plea related and thus inadmissible under Supreme Court Rule 402(f) must be made on a case-by-case basis. *People v. Friedman* (1980), 79 Ill. 2d 341, 351-52.

In determining whether or not a statement is plea related, our supreme court has found the applicable analysis to be as follows: first, whether the accused exhibited any subjective expectation to negotiate a plea, and second, whether this expectation was reasonable under the totality of the objective circumstances. (*Friedman*, 79 Ill. 2d at 352-53.) Keeping in mind that the facts peculiar to each case determined whether the statements therein were plea related, we will examine the cases relied on by the parties.

█ In *Friedman*, the defendant was charged with theft by deception. A month after his indictment, he spoke by telephone with Stan Kaiser, an investigator for the office of the Attorney General. At defendant's trial, Kaiser testified that defendant inquired about making a deal and that he would rather go to a Federal prison than a State prison. Kaiser informed the defendant that he had no control over that. In holding that defendant's statement to Kaiser was an inadmissible plea-related statement, our supreme court stated:

"In the present case, defendant's unsolicited statement was an offer to enter negotiation, stating generally the terms upon which defendant would be willing to bargain. We cannot agree with the State that an essential element of a plea discussion is the requirement that the statement sought to be excluded be made 'as an integral part of a *bona fide* negotiation' with the appropriate parties in attendance. The fact that the party to whom this statement was made did not have the actual authority to enter negotiations is not, standing by itself, sufficient to render the statement admissible. [Citation.] Defendant could have reasonably assumed that Kaiser was an appropriate party to whom he could convey his offer to bargain. [Citation.]

Nor can we agree that the parties must be seated at the ne-

gotiating table before our rule applies. A statement made as an offer to enter negotiation is indistinguishable from a statement made at an advanced stage of the negotiation process in terms of its impact upon a jury. Statements related to either stage of this process are equally devastating in the trial of the accused. In determining whether a statement is plea related, we do not require 'a preamble explicitly demarcating the beginning of plea discussions.' [Citation.] But where a preamble is delivered, such as defendant's inquiry related to 'making a deal' in the present case, it cannot be ignored. [Citation.] This is a clear indication of the defendant's intent to pursue plea negotiations." (79 Ill. 2d at 352.)

The supreme court did agree with the State that there is a distinction between a statement made in furtherance of a plea discussion and an otherwise independent admission, stating as follows:

"Where a defendant's subjective expectations are not explicit, the objective circumstances surrounding defendant's statement take precedence in evaluating defendant's subsequent claim that the statement was plea related. Before a discussion can be characterized as plea related, it must contain the rudiments of the negotiation process, *i.e.*, a willingness by defendant to enter a plea of guilty in return for concessions by the State." *Friedman*, 79 Ill. 2d at 353.

■ However, not all statements made in hopes of some concessions are necessarily plea discussions. (*People v. Victory* (1981), 94 Ill. App. 3d 719, 722.) In *Victory*, Officer Geiseman testified that after defendant was arrested for armed robbery and armed violence, he was transported to the Du Page County jail. While en route to the jail, the defendant stated to him that he realized he was charged with a Class X felony for which he could get a maximum of 30 years. Defendant further stated that he could not "afford to take an armed robbery charge, and that he would [be willing to] accept 10 years, and would the State's Attorney be willing to plea bargain." (*Victory*, 94 Ill. App. 3d at 721.) Officer Geiseman advised him that he did not know and that the defendant should contact the State's Attorney. Officer DeVires, the other officer transporting the defendant to jail, testified that the defendant said something to the effect that it was a Class X felony, and he wondered "what type of arrangement could be made with the State's Attorney's Office."

In determining that the defendant's statements were not plea related and, therefore, properly admitted, this court, addressing the first part of the test set forth in *Friedman*, whether the accused ex-

hibited a subjective expectation to negotiate a plea, stated as follows:

"The testimony at trial was that defendant's statement at issue was made to arresting officers within hours after the crime en route to the jail and subsequent to his having made a substantially exculpatory statement to those officers and having been apprehended by them in possession of the victim's property after a chase. His statement, in part, 'would the State's Attorney be willing to plea bargain,' indicates to us that he knew the State's Attorney was the one who had authority to negotiate. He did not ask the officers to make contact with the State's Attorney for him, to convey to the State's Attorney any offer to plea bargain nor did he testify at trial what his expectations were. We characterize the defendant's comment to these officers, in this context, as a question expressing his concern about the length of time of possible incarceration designed to elicit their opinion on that rather than to initiate plea negotiations. In this sense, the defendant was not asking these officers to plea bargain or convey any plea offer to the State's Attorney, but was determining if the State's Attorney did plea bargain to soothe his anxiety over the possible sentence he might serve. Coupled with his statement that he could 'get a maximum of 30 years' and 'he would accept 10 years,' his failure to pursue plea discussions with the officers and the absence of a request to convey anything to the State's Attorney, lends support that this is an admission showing guilty knowledge rather than a subjective expectation or attempt to enter plea discussions." 94 Ill. App. 3d at 723-24.

In *Victory*, this court distinguished *People v. Friedman* on the basis that in *Friedman*, the defendant made a specific offer to an investigator with whom the defendant had prior conversations about the case against the defendant, whereas in *Victory*, it is apparent from the defendant's own statement that he knew the officers had no authority to negotiate with him. Moreover, nothing the officers said or did could be interpreted as initiating plea discussions, and the defendant never asked the officers to communicate with the State's Attorney on his behalf. Therefore, we found that the defendant did not have a reasonable expectation that he was either negotiating a bargain or initiating plea discussions to be conveyed to the State's Attorney. *Victory*, 94 Ill. App. 3d at 724.

In *People v. Tennin* (1984), 123 Ill. App. 3d 894, this court was again asked to determine whether a defendant's statement was plea related and, therefore, improperly admitted. Detective Steven Ander-

son testified that while he was interrogating the defendant just after his arrest, he talked to the defendant about a person named "Pena Boy," who was suspected of an unrelated crime. Anderson stated:

" 'After I gave him the statement and we were bringing him back to the cell, he stated did I know Pena Boy and I said yes. I said, "Where is he at?" He said, "I want to make a deal." I said, "I don't make deals." ' " 123 Ill. App. 3d at 896.

After examining several decisions, including *People v. Friedman* (1980), 79 Ill. 2d 341, this court, in determining that the defendant's statement, "I want to make a deal," was not plea related and therefore not violative of Supreme Court Rule 402(f), stated as follows:

"Defendant's subjective expectations in the case at hand are not explicit when we look to his sole statement in the record concerning negotiation, *i.e.*, 'I want to make a deal.' After Detective Anderson testified to this statement, defendant did not seek to explain outside the presence of the jury what his state of mind was in making this statement. Although an accused's subsequent account of his prior subjective mental impression cannot be the sole determinative factor [citation], it is a factor that can be considered in determining his subjective intent. Since defendant's subjective expectations are not explicit, we must focus on the objective circumstances surrounding defendant's statement to determine if it is plea-related.

\*\*\* Defendant here has not made manifest any indication to plead guilty or what the terms are under which he would be willing to bargain. We cannot assume that every statement by a defendant to the effect of 'making a deal' is plea-related. There are other possible explanations underlying a motivation to make a 'deal,' such as a defendant negotiating for his release without a cash bond or on a low bond, or the dropping of charges against him in return for information he might supply. Not all statements made in the hopes of some concession are necessarily plea discussions. [Citation.] On this record, the defendant has not demonstrated a subjective expectation to negotiate a plea and we find no error in admission of his statement." 123 Ill. App. 3d at 897-98.

■ Based upon the record before us, we are convinced that the defendant has not demonstrated a subjective expectation to negotiate a plea. The fact that defendant did not use the words "I want to make a deal" is not determinative either way. (See *Tennin*, 123 Ill. App. 3d at 898.) However, although defendant indicated that he had information about narcotics dealers, the record is unclear as to the

purpose he was offering the information. Defendant never stated or otherwise indicated that he was willing to plead guilty to the charge against him. (See *Friedman*, 79 Ill. 2d at 353.) The defendant argues that his statement that he would like to "work this off" indicated that he was not seeking to have the charges dropped in exchange for the information but rather was seeking an alternative to a jail sentence. Defendant never explained what "work this off" meant. Rather, defendant admitted that he had made the statement so that he could go home.

As we have previously stated, not all statements made in the hopes of some concessions are plea related. Defendant's use of the ambiguous phrase "work this off" does not sufficiently demonstrate that he was initiating plea discussions. Rather, it is just as compelling to conclude from the record that he was attempting to trade information about narcotics dealers for the dropping of the charge against him (*Tennin*, 123 Ill. App. 3d at 898) or that he just wanted to go home, as defendant himself admitted.

Both the State and the defendant in this case have been granted leave by this court to cite additional authority. The defendant has cited *People v. Connolly* (1989), 186 Ill. App. 3d 429, and the State has cited *People v. Burns* (1989), 188 Ill. App. 3d 716. In *Connolly*, the Appellate Court for the Fourth District in relying on *People v. Friedman* (1980), 79 Ill. 2d 341, determined that the defendant's inquiry as to whether deals could be made in Mason County was plea related and, therefore, not admissible. Neither *Tennin* nor *Victory* was discussed or cited in *Connolly*. In *Burns*, the same panel in the fourth district, citing *Friedman* and *People v. Tennin*, determined that defendant's statement to the arresting officer that " 'he could help out,' that he could 'do someone in Wisconsin' as long as he were not 'thrown in jail' " could not be characterized as plea negotiations and was admissible. *Burns*, 188 Ill. App. 3d at 719.

■ One district of the appellate court is not in all instances bound to follow the decisions of other districts of the appellate court. However, there are compelling reasons to do so unless a district has made a determination of its own contrary to that of another district, or there is a split of authority among the districts. (*In re K.E.* (1987), 151 Ill. App. 3d 1055, 1057, *rev'd on other grounds* (1988), 118 Ill. 2d 544.) We are mindful of the dictate of *People v. Friedman* that such cases must be decided on their own facts. (*Friedman*, 79 Ill. 2d at 351-52.) Given that this court has previously determined that similar statements are not plea related, we are not obligated to follow *People v. Connolly*. See *People v. Burns* (1989), 188 Ill. App. 3d 716; *People*

*v. Tennin* (1984), 123 Ill. App. 3d 894; *People v. Victory* (1981), 94 Ill. App. 3d 719.

We conclude, therefore, that the defendant's statement was not plea related and was properly admitted.

Defendant also contends that insinuations by the prosecutor that Glen Negler, defendant's alibi witness, had been paid by the defense to testify denied him a fair trial.

The record reflects that this line of questioning by the prosecutor was for the most part not objected to by the defendant, nor was it raised in defendant's post-trial motion. Nevertheless, the defendant maintains that this court should consider this issue as "plain error" (107 Ill. 2d R. 615(a)), relying on *People v. Starks* (1983), 116 Ill. App. 3d 384. In that case, on appeal, the defendant raised issues relating to the State's cross-examination of witnesses and its closing argument, although much of what was raised on appeal had not been objected to at trial. The reviewing court elected to invoke the "plain error doctrine" because the record showed the commission of errors which deprived the defendant of a fair trial. 116 Ill. App. 3d at 389.

■ After reviewing the record in this case, we find no error in the cross-examination of Negler as conducted by the prosecutor in this case. Defendant asserts that when Negler testified that he expected to be paid for testifying, it was clear that he was referring to the $15 witness fee that he was to receive. However, on rebuttal, Detective Strickland testified that, in addition, Negler told him that he expected the defendant to pay him for "saving his ass." What the prosecutor was attempting to show was that in addition to the $15 witness fee Negler was to receive, he had also stated in the presence of the prosecutor and Detective Strickland that he also expected to be paid by the defendant. When Negler did not recall that part of the conversation, Detective Strickland was called to testify on rebuttal to that part of the conversation. Viewing the record as a whole, we find no evidence or insinuation by the prosecutor that the public defender's office had offered to pay Negler to testify.

In the cases relied on by the defendant (*People v. Emerson* (1983), 97 Ill. 2d 487, and *People v. Beringer* (1987), 151 Ill. App. 3d 558), the prosecutor offered no evidence to support statements in his closing argument that the defense had fabricated a defense theory (*Emerson*, 97 Ill. 2d 487) or to substantiate the State's cross-examination of a defense witness as to whether the witness had been coached to say what the defense wanted and as to whether he had told the prosecutors he would say whatever they wanted in exchange for money (*Beringer*, 151 Ill. App. 3d 558). In the case before us, the testimony

of Detective Strickland substantiated the State's allegation that Negler had sought money in exchange for his testimony separate and apart from the $15 witness fee he knew he would be receiving from the public defender's office.

■ The latitude permitted on cross-examination to establish bias is within the trial court's discretion. (*People v. Testa* (1984), 125 Ill. App. 3d 1039, 1046.) Moreover, a prosecutor has a duty to discuss the witnesses and their credibility. (*People v. Burba* (1985), 134 Ill. App. 3d 228, 236.) Since Negler was providing the defendant with an alibi, the prosecutor here would have been remiss if she had not sought to establish that Negler had a monetary motive for his testimony. Since no error occurred, the "plain error doctrine" is not applicable. 107 Ill. 2d R. 615(a).

The judgment of the circuit court of Kane County is affirmed.

Affirmed.

UNVERZAGT, P.J., and DUNN, J., concur.