**UNITED STATES of America ex rel.
Joseph BERINGER, Petitioner,**

v.

**James E. O'GRADY, et al.,
Respondents.**

**No. 89 C 7327.**

United States District Court,
N.D. Illinois, E.D.

May 7, 1990.

pone the inevitable transfer of this action to the situs of the mortgaged real estate.

Randolph N. Stone, Public Defender of Cook County by Emily Eisner, Asst. Public Defender, Chicago, Ill., for petitioner.

Neil F. Hartigan, Atty. Gen., State of Ill. by Terence M. Madsen, Jack Donatelli, Asst. Atty. Gen., Chicago, Ill., for respondents O'Grady, Leak, Glotz, Lane and Schreier.

Cecil A. Partee, State's Atty. of Cook County by Inge Fryklund, David King, Howard Pikel, Michele I. Lavin, Asst. State's Atty., Chicago, Ill., for respondents O'Grady, Leak, Glotz and Schreier.

Neil F. Hartigan, Atty. Gen., State of Ill. by Richard S. London, Asst. Atty. Gen., Chicago, Ill., for respondent Lane.

## MEMORANDUM ORDER

BUA, District Judge.

Petitioner Joseph Beringer ("petitioner") was charged with the murder of Joanne Barkauskas in 1981. He was tried and convicted for the murder in 1983, but the Appellate Court of Illinois for the First District reversed his conviction, finding that the prosecution's conduct during the 1983 trial "was so egregious as to deny [petitioner] a fair trial." *People v. Beringer*, 151 Ill.App.3d 558, 564, 104 Ill.Dec. 916, 919, 503 N.E.2d 778, 781 (1987). Petitioner now argues that the prosecutorial misconduct which occurred during his 1983 trial was intentional. Based on that argument, he claims the State is barred from retrying him under the double jeopardy analysis set forth in *Oregon v. Kennedy*, 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982). The Illinois courts have rejected petitioner's double jeopardy argument, so he filed this case seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Specifically, petitioner seeks an order releasing him from state custody and barring the State of Illinois from reprosecuting him for the 1981

murder charges. For the reasons stated herein, the petition for a writ of habeas corpus is denied.[1]

## FACTS

On July 16, 1981, Joanne Barkauskas ("Joanne") was shot to death. She was walking to a bus stop on her way to work when she was shot in the back and killed in the vicinity of 42nd and Artesian in Chicago, Illinois. Four individuals were charged with the murder: petitioner; petitioner's brother, Kenneth Beringer ("Kenny"); petitioner's and Kenny's roommate, James Galason ("Galason"); and the victim's husband, Edward Barkauskas ("Ed"). Galason pled guilty and testified for the State at the trial of petitioner and his brother.[2] At that trial, Galason stated that Ed approached him in the early part of July 1981 and asked him if he would kill Ed's wife, Joanne, in return for some of the insurance proceeds. Galason agreed to perform the murder. According to Galason, Ed had separately asked Kenny to commit the murder, and Ed had given Kenny a photograph of Joanne so that Kenny could identify her. Galason testified that during the first two weeks of July 1981, on various occasions he discussed committing Joanne's murder with petitioner, Kenny, and Ed.

Galason's testimony concerning the murder was as follows. On the morning of July 16, 1981, Galason and petitioner were picked up by Ed. Ed drove them to a maroon Camaro which petitioner and Kenny had stolen the night before for the purpose of using it as a getaway car. Petitioner and Galason entered the Camaro with the shotgun which Galason had obtained for the shooting. Galason drove the Camaro to the area near 42nd and Artesian. Ed had told Galason and petitioner that Joanne would pass by that area around 8:00am. For a short time, Galason and petitioner waited in the Camaro for Joanne to pass by. Petitioner then exited the car with the shotgun and continued waiting behind a garage in an alley, while Galason remained in the car. When Joanne finally appeared, petitioner jumped out from behind the garage, shot her twice in the back, and returned to the car. Galason then drove the car a short distance to a dead end street, where he and petitioner wiped their fingerprints off the car, exited the car, and hid the shotgun in the brush surrounding some nearby railroad tracks. Galason and petitioner then decided to split up and flee from the area. However, a policeman who had received a call regarding the shooting spotted Galason and petitioner as the two were walking down the street. When Galason began to run, the policeman chased Galason all the way back to his apartment, where he was arrested a short time later along with Kenny. Petitioner was arrested the next day.

A review of the trial record reveals that the State presented a great deal of evidence which corroborated much of Galason's story. A man named John Brender, who lived on the street where the Camaro had been abandoned, testified that he saw two men park and exit the Camaro at approximately 8:00am on July 16, 1981. Brender stated that he was letting his dog out of the house when he saw one man get out of the passenger side carrying "something wrapped up" which looked like a rifle. Brender identified Galason as the man he saw get out of the driver's side and petitioner as the man who exited the passenger side with the rifle.

1. Earlier in this case, this court adopted Magistrate Gottschall's ruling granting petitioner's motion for a temporary restraining order. Pursuant to that order, the state court criminal proceedings against petitioner have been stayed. Petitioner has also moved for a preliminary injunction, but no ruling has yet been issued on that request. Since a decision on the motion for a preliminary injunction would require the same extensive review of the record necessary to decide the merits of this case, and since the parties have agreed to have the court resolve the merits at this time, the court finds that a decision on the merits is now appropriate in lieu of a ruling on the motion for a preliminary injunction.

2. Edward Barkauskas was tried separately from the Beringer brothers. A jury convicted him of murder, armed violence, solicitation, and conspiracy. He was sentenced to natural life in prison without parole. *See People v. Barkauskas,* 147 Ill.App.3d 360, 100 Ill.Dec. 821, 497 N.E.2d 1183 (1986).

Officer Martin Lee of the Chicago Police Department testified that while driving in the vicinity of the shooting shortly after 8:00am on July 16, 1981, he spotted Galason and petitioner walking down the street. Thinking that the two matched the description of the shooting suspects which had been broadcast on his police radio, Officer Lee stopped Galason and petitioner with his gun drawn. Officer Lee testified that when Galason took off running, he chased Galason all the way back to his apartment and then arrested him when reinforcements arrived.

Chicago Police Officer John Rossi testified that he recovered the shotgun used in the murder from the weeds where Galason had stated that he and petitioner had stashed it. The shotgun was introduced as evidence. Chicago Police Officer Robert Dieringer testified that Kenny's fingerprints were found in the Camaro. The fingerprints were offered as evidence. Another officer, Thomas Ptak, testified that after his arrest Kenny admitted to possessing a photograph of Joanne and hiding it in the sofa in his apartment. Officer Ptak stated that he later recovered the photo from the sofa; the photo was introduced as evidence. Finally, Assistant State's Attorney Michael Levitin told the jury of a statement Kenny gave to the police officers shortly after his arrest, and Assistant State's Attorney Paul Kerpan read into evidence the signed statement which petitioner gave to law enforcement officials following his arrest. In those statements, petitioner's and Kenny's accounts of the incidents surrounding the murder were substantially similar to the story told by Galason on the witness stand. In his statement, petitioner specifically admitted that he was the one who shot Joanne and that Galason drove the Camaro.

At the conclusion of the State's case, the first evidence offered by the defense was the testimony of Harvey Webb, who was the only eyewitness to the murder. Prior to trial, both the prosecution and the defense had informed the trial judge that they had experienced difficulty in locating Webb. At that time, petitioner's attorneys stated their belief that the prosecutors had been intentionally concealing Webb from the defense and attempting to prevent him from testifying. Webb was eventually brought into court to testify, but only after the judge issued a warrant for his arrest pursuant to the requests of the defense.

Webb testified that he used to see Joanne virtually every morning near the corner of 42nd and Artesian. Webb stated that he would pass by Joanne as he was walking to his job at a car wash; she was apparently on her way to a bus stop. Webb testified that as he was walking to work on the morning of July 16, 1981, he saw a man with a shotgun exit the passenger side of a maroon Camaro. The man fired two shots at Joanne and got back into the car. Another person then drove the car away. According to Webb, the man he saw fire the shots was approximately six feet tall with long blond hair—a description roughly matching the appearance of Galason. Webb stated that prior to trial, he identified Galason as the shooter from a picture of Galason shown to him by state prosecutors. Webb testified that when he identified Galason, however, the prosecutors told him, "that['s]. not the guy." Webb further testified that petitioner was not the man he saw do the shooting.

On cross-examination, the prosecution tried to impeach Webb by suggesting that he had solicited money from prosecutors in exchange for his testimony, that he had used drugs before he spoke to the State's Attorney's office, and that he felt the police had caused him to lose his job. Specifically, the prosecution cross-examined Webb as follows:

Q: Didn't you call me and tell me you were locked up on a disorderly?

A: No, sir.

Q: And you wanted me to get you out of jail?

A: No, sir.

Q: Didn't you tell me that?

A: No, sir.

Q: And that you would come into this court if I paid you money, didn't you tell me that?

A: No, sir.

Q: And you would say anything—

MR. STAMOS [Kenny's attorney]: If I may make an objection, inserting himself in this case as a witness. It is improper for him to be asking these forms of questions, get on the stand and testify.

THE COURT: You will have to perfect your impeachment.

MR. WADAS [State's attorney]: I understand that.

Q: Didn't you tell me, Mr. Webb, if I scratch your back you will scratch my back, didn't you tell me that?

A: No, sir.

&ast; &ast; &ast; &ast; &ast; &ast;

Q: How much did you have to drink before you came to our office that morning?

MS. PLACEK [Petitioner's attorney]: Objection.

THE COURT: Overruled. I will sustain the form, as to the form.

MR. WADAS:

Q: Had you been drinking that morning?

A: A glass of orange juice.

Q: Had you been drinking any alcoholic beverages?

A: I had not been out of the house.

Q: How much of any reefer did you smoke that morning?

MS. PLACEK: Objection.

MR. WADAS:

Q: Did you take any drugs or smoke any reefer that morning?

A: I don's mess with it.

Q: You don't mess with reefer?

A: No.

&ast; &ast; &ast; &ast; &ast; &ast;

Q: Didn't you tell us, Mr. Webb, you didn't remember anything about the case and you didn't want to remember anything about the case, didn't you say that?

A: No, sir.

Q: You didn't ask us how much money we were going to pay you to come into court?

A: No, sir.

Q: You didn't ask us for money to testify?

A: I didn't ask for anything.

Q: Told us what you wanted to say, if we paid you money?

A: I ask [sic] you for a cigarette.

&ast; &ast; &ast; &ast; &ast; &ast;

Q: Didn't Ms. Placek tell you, ["]now remember Harvey put it on the police and the State's Attorney[;] you lost your job because of the police["]—

MS. PLACEK: I am going to object to that and it is a personal attack against me.

THE COURT: Be seated. The jury will disregard that.

MR. WADAS:

Q: Did Marijane Placek say that to you or not?

A: No, sir.

Q: She didn't tell you, ["]remember to put it on the police[;] that is the reason why you lost your job["]?

A: No, sir.

After Webb's testimony, Kenny and petitioner also testified on their own behalf, but the jury was apparently unimpressed with the case presented by the defense. Kenny and petitioner were both convicted of murder. On petitioner's appeal, however, his conviction was reversed and the case was remanded for retrial. *People v. Beringer*, 151 Ill.App.3d 558, 564, 104 Ill. Dec. 916, 919, 503 N.E.2d 778, 781 (1987). The court found:

[The] unsubstantiated cross-examination [of Harvey Webb] destroyed Harvey Webb's credibility before the jury. None of [the above-cited] questions had any factual foundation. On at least one occasion the judge reminded the prosecutor the he would have to perfect his impeachment, but he never did.... [T]he "unfounded insinuation" was "substantial" because the prosecutors implied that Webb twice suborned perjury, used drugs, and conspired to change his testimony. Second, the objectionable questions were "repeated" occurring at no less than four separate points during cross-examination. Third, the questions prejudiced the defendant because after the eyewitness Webb was impeached, the

uncontroverted evidence indicated that the defendant was the shooter, a fact the judge specifically relied upon in his sentence of natural life without parole.

The State's cross-examination also impugned the integrity of defense counsel, further prejudicing defendant. (citations omitted). Moreover, the prejudice that accrued to defendant could not be cured by the court's instructions because the prosecutor repeated the prejudicial question after the objection had been sustained and the jury instructed to disregard it. Thus, the unperfected cross-examination constituted reversible error.

151 Ill.App.3d at 561–62, 104 Ill.Dec. at 918, 503 N.E.2d at 780.

After determining that the prosecutor's prejudicial remarks during closing argument constituted separate grounds for reversal, the court then concluded its review of the case by adding:

> Our disposition makes it unnecessary for us to consider the remaining issues raised by the defendant on appeal. We note, however, that we believe the evidence at trial was sufficient for the trier of fact to conclude that defendant was guilty beyond a reasonable doubt. This does not mean we are making a finding as to defendant's guilt or innocence which would be binding on retrial, but rather our consideration of the sufficiency of the evidence admitted at trial will remove the risk of subjecting the defendant to double jeopardy.

151 Ill.App.3d at 564, 104 Ill.Dec. at 919, 503 N.E.2d at 782.

Upon the remand of the case, the petitioner moved the trial court to bar his retrial on the grounds that the prosecutor's misconduct during the cross-examination of Harvey Webb was intentional. On June 7, 1988, the trial court denied petitioner's motion, and petitioner then filed an interlocutory appeal. Petitioner's appeal was denied by both the Illinois Appellate Court and the Illinois Supreme Court. The trial court then set September 25, 1989, as the date for petitioner's retrial, prompting petitioner to file the instant action.

## DISCUSSION

Petitioner's habeas claim is based on *Oregon v. Kennedy*, 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982). In that case, the Supreme Court held that the Double Jeopardy Clause of the Fifth Amendment bars retrial of a defendant where the prosecutor engages in misconduct during the defendant's trial with the intent to provoke a mistrial. *Id.* at 675, 102 S.Ct. at 2089. Petitioner argues that his retrial is barred under *Kennedy* because the state prosecutor committed gross misconduct during his cross-examination of Harvey Webb with the intent to provoke a mistrial. Respondents[3] argue that the habeas petition should be denied for three reasons: (1) because of the tardy filing of the petition; (2) because rulings by the Illinois courts have already settled the issue presented in this case; and (3) because the record shows no intent on the part of the state prosecutors to provoke a mistrial. The court will address each of the points in turn.

### I. The Late Filing of the Habeas Petition

▪ Under Rule 9(a) of the Rules Governing § 2254 Cases, "[a habeas] petition may be dismissed if it appears that the state of which respondent is an officer has been prejudiced in its ability to respond to the petition by its delay in filing." Undeniably, there was some delay on the part of the petitioner in filing his habeas claim. Petitioner's motion to bar retrial was denied by the state trial court on June 7, 1988, and his state appeals of that ruling were exhausted by March 1, 1989. Petitioner did not file this habeas action until over six months later, just one week prior to the date set for retrial. Respondents argue that this delay was prejudicial because it required the postponement of a

---

3. Petitioner names the following respondents: James O'Grady, Sheriff of Cook County; Spencer Leak, Director of the Cook County Department of Corrections; Robert E. Glotz, Assistant Director of Security of the Cook County Department of Corrections; Michael Lane, Director of the State of Illinois Department of Corrections; and the Honorable James M. Schreier, Associate Judge of the Circuit Court of Cook County.

trial at which twenty to twenty-five witnesses were scheduled to testify.

The court finds that petitioner's six-month delay in filing the instant case does not constitute a sufficiently significant delay which warrants dismissal of his habeas claim. Moreover, in construing Rule 9(a), the Supreme Court has held:

"Congress has not seen fit . . . to provide the State with an additional defense to habeas corpus petitions based on the difficulties that it will face if forced to retry the defendant. The Judicial Conference Advisory Committee on Criminal Rules has drafted a proposed amendment to Rule 9(a), which would permit dismissal of a habeas corpus petition upon a demonstration that the State has been prejudiced, either in defending against the prisoner's federal claim or in bringing the prisoner to trial again should the claim prove meritorious. . . . That proposal has not been adopted. . . . We should not lightly create a new judicial rule, in the guise of constitutional interpretation, to achieve the same end."

*Vasquez v. Hillery,* 474 U.S. 254, 265, 106 S.Ct. 617, 624, 88 L.Ed.2d 598 (1986). Under *Vasquez,* respondents have not shown the type of prejudice which justifies dismissal under Rule 9(a). Therefore, respondents' request for denial of the habeas petition based on its tardy filing is rejected.

*II.   Prior State Court Rulings Regarding Double Jeopardy*

■ The statute under which this action is brought, 28 U.S.C. § 2254, expressly provides that where a state court of competent jurisdiction makes a determination as to a factual issue after conducting a hearing on the issue at which both the habeas petitioner and the State were present, the state court's factual finding "shall be presumed to be correct." 28 U.S.C. § 2254(d). In *Kennedy,* the Court made clear that the determination of whether a prosecutor intended to cause a mistrial is a question of fact. 456 U.S. at 675, 102 S.Ct. at 2089. Respondents claim that three Illinois courts have already made the factual determination that the prosecutors in petitioner's murder trial did not intend to cause a mis-

trial: (1) the appellate court which reversed petitioner's conviction; (2) the trial court which subsequently rejected petitioner's motion to bar his retrial; and (3) the appellate court which affirmed the decision denying petitioner's motion to bar retrial. As a result of these state court decisions, respondents argue, under § 2254(d) petitioner is barred from arguing that the prosecutorial misconduct during his 1983 murder trial was intentional.

The court rejects respondents' contention that the state appellate court decisions contain factual findings that no intentional prosecutorial misconduct took place during petitioner's 1983 trial. The appellate court which affirmed the trial court's denial of petitioner's motion to bar retrial issued only a one-page order granting the State's motion to dismiss the appeal. *People v. Beringer,* No. 88–2129 (Ill.App.Ct., First District, September 29, 1988). That decision made no factual findings entitled to deference under § 2254(d). *See United States ex rel. Smith v. Fairman,* 769 F.2d 386, 395 (7th Cir.1985) (court should not assume factual findings are implicit in a state court decision which could have rested on other grounds).

Similarly, the appellate court decision which reversed petitioner's conviction did not even reach the issue of intent to cause a mistrial; it simply held that the prosecution's cross-examination of Harvey Webb and its closing argument constituted grounds for reversal. *People v. Beringer,* 151 Ill.App.3d 558, 564, 104 Ill.Dec. 916, 919–20, 503 N.E.2d 778, 781–82 (1987). Although that court did remand the case for retrial and did declare that a retrial of petitioner would not violate double jeopardy, the court did not engage in a *Kennedy*-type of analysis. The court made its double jeopardy reference in discussing the sufficiency of the evidence against petitioner, preempting any double jeopardy claim petitioner might have made based on an argument that there was insufficient evidence to convict him. *Id.* The court did not make any ruling regarding petitioner's double jeopardy claim based on intentional prosecutorial misconduct. Thus, respon-

dents cannot invoke the appellate court decision reversing petitioner's conviction to support their assertion that petitioner's claim must be dismissed pursuant to § 2254(d). *See United States v. Curtis,* 683 F.2d 769, 771–72 (3rd Cir.) (finding that an order of remand does not automatically preclude a subsequent finding of double jeopardy), *cert. denied,* 459 U.S. 1018, 103 S.Ct. 379, 74 L.Ed.2d 512 (1982).

However, respondents' § 2254(d) argument is supported by the state trial court's June 7, 1988 ruling which rejected petitioner's motion to bar retrial. In making that ruling, Judge James M. Schreier specifically found that the state prosecutors did not intend to provoke a mistrial. Even though Judge Schreier was not the judge who presided over petitioner's original murder trial, Judge Schreier's factual determination is still entitled to deference under § 2254(d). Judge Schreier made his determination in the same manner as would a state appellate court; he reviewed the trial record and held a hearing at which both petitioner and the State presented arguments. It is well-settled that under § 2254(d) deference is due to state appellate court factual findings in the same way that it is due to state trial court findings, even though the appellate court simply reviews the evidence contained in the trial record and does not participate in the creation of the evidentiary record. *See Sumner v. Mata,* 449 U.S. 539, 545–47, 101 S.Ct. 764, 785–86, 66 L.Ed.2d 722 (1981); *see also Fugitt v. Lemacks,* 833 F.2d 251, 252 (11th Cir.1987); *Rose v. Duckworth,* 769 F.2d 402, 405 (7th Cir.1985). Therefore, under § 2254(d), Judge Schreier's determination is presumed correct.[4]

Nevertheless, contrary to respondent's assertion, Judge Schreier's ruling does not foreclose petitioner's habeas claim. Under § 2254(d)(8), this court need not accept

Judge Schreier's factual finding if it concludes that "such factual determination is not fairly supported by the record." Therefore, while § 2254 limits this court's review of petitioner's habeas claim, it does not foreclose this action entirely. Petitioner can succeed on his habeas claim if he shows that Judge Schreier's factual determination is not fairly supported by the trial record. *Rose v. Duckworth,* 769 F.2d at 405. Respondents address that issue in their third argument.

## III. Evidence of Prosecutorial Intent to Provoke a Mistrial

Petitioner relies on numerous facts and inferences in attempt to show intentional prosecutorial misconduct during the cross-examination of Harvey Webb. He first claims it is clear that the State wanted a mistrial because Webb's testimony was particularly devastating to the State. Petitioner points out that Webb, a disinterested party and the only eyewitness, testified in direct opposition to the State's case that Galason, not petitioner, was the shooter. Petitioner also argues that the only rational explanation for the prosecution's outrageous cross-examination of Webb, which included unfounded remarks disparaging Webb's integrity and unwarranted personal attacks against defense counsel, is that the prosecutor intended to cause a mistrial. Petitioner contends that further evidence of the prosecutor's intent is that the prosecutor used these tactics repeatedly—and in the face of admonishments from the trial judge—despite knowing that his actions were improper.

Finally, petitioner claims the record shows that prior to trial, the prosecution intentionally tried to conceal Webb's whereabouts and Webb's prospective testimony from the defense. Petitioner argues that

**4.** Petitioner argues that the issue before Judge Schreier was a mixed question of fact and law, not a purely factual question, and thus Judge Schreier's determination is not entitled to deference under § 2254(d). The court rejects this argument. *Kennedy* makes clear that the question of prosecutorial intent is a factual one. 456 U.S. at 675, 102 S.Ct. at 2089. Petitioner also argues that in reaching his ruling, Judge Schreier applied the wrong legal standard, making his findings flawed. This contention is also without merit. "A determination of intention is a finding of fact that requires making inferences from objective facts and circumstances." *Rose v. Duckworth,* 769 F.2d at 402. That is precisely the kind of factual analysis that Judge Schreier employed.

this pre-trial conduct evidences the prosecutor's desire to prevent Webb from testifying. At the very least, claims petitioner, the State's pretrial conduct shows that the State knew Webb was a drifter who was difficult to locate. Thus, the State knew that if petitioner had to be retried, there was a reasonable likelihood that Webb would be unavailable for the second trial, greatly enhancing the State's chances for conviction.

In evaluating petitioner's allegation of intentional prosecutorial misconduct, the court finds it significant that during his trial petitioner never moved for a mistrial on the grounds which now form the basis for his habeas claim. Arguably, if the prosecution had in fact intended to cause a mistrial, such an intention would have been most apparent to petitioner and his counsel during the trial, when the alleged misconduct was taking place. Despite ample opportunity, however, petitioner never moved for mistrial based on the prosecutor's cross-examination of Harvey Webb, a cross-examination which petitioner now claims was riddled with instances of intentional misconduct.[5]

Petitioner's failure to move for a mistrial based on the cross-examination of Webb is particularly telling because he moved for a mistrial based on *other* grounds shortly after the cross-examination of Webb.[6] Thus, petitioner cannot claim that his failure to request a mistrial based on the State's cross-examination of Webb was merely an oversight. Nor can petitioner argue that during trial he did not have sufficient evidence of the prosecutor's intent. All of the facts and inferences on which petitioner now relies to show inten-

tional prosecutorial misconduct were available to petitioner prior to or at the time of the State's cross-examination of Webb.

The court also finds it significant that the trial judge did not declare a mistrial. Even absent a motion from petitioner, the trial judge certainly would have declared a mistrial if he determined the prosecutor was intentionally conducting improper cross-examination in order to get a mistrial. Respondents argue that because the trial court did not declare a mistrial, this case is markedly dissimilar to *Kennedy*, in which the trial judge did order a mistrial. Respondents maintain that the ruling in *Kennedy* should not be extended to situations where, as here, the case is reversed for prosecutorial misconduct; they argue that a double jeopardy claim under *Kennedy* should be available only where the trial court declares a mistrial. The court rejects respondents' position. Adopting respondents' interpretation of *Kennedy* would make a defendant's constitutional right to claim double jeopardy dependent on whether the trial court correctly recognizes that a mistrial is in order—a fact wholly outside the power of the defendant. This court, in accord with other courts discussing the issue, fails to see any justification for such a rule. *See United States v. Rios*, 637 F.2d 728, 729 (10th Cir.1980), *cert. denied*, 452 U.S. 918, 101 S.Ct. 3054, 69 L.Ed.2d 422 (1981); *Petrucelli v. Smith*, 544 F.Supp. 627, 632–33 (W.D.N.Y.1982), *rev'd on other grounds*, 735 F.2d 684 (2d Cir.1984). *See also United States v. Curtis*, 683 F.2d 769, 774–75 (3rd Cir.) (favorably discussing the *Rios* and *Petrucelli* approach), *cert. denied*, 459 U.S. 1018, 103 S.Ct. 379, 74 L.Ed.2d 512 (1982).[7] Therefore, the court

---

**5.** During the trial, Kenny moved for a mistrial based on the prosecution's cross-examination of Webb only once. That motion was prompted by the prosecution's questioning Webb if it was true that he had only come to testify after being subpoenaed and arrested. The trial court denied that motion, which came at the very beginning of the cross-examination. Throughout the remainder of the trial, Kenny, like petitioner, never moved for a mistrial based on the prosecution's cross-examination. Moreover, the question which prompted Kenny's motion for mistrial was not cited by the Illinois Appellate

Court as one of the improper questions which constituted grounds for reversal.

**6.** Petitioner's motion for mistrial was based on the prosecutor's alleged pre-trial misrepresentations to defense counsel. Prior to trial, the prosecutors had stated that the State had not had any recent contact with Webb. Petitioner argued that Webb's testimony contradicted that statement.

**7.** However, the court concedes that respondents' argument has slightly more merit where, as in this case, defendant has failed to even move for

finds that the trial judge's failure to declare a mistrial does not preclude petitioner's double jeopardy claim based on intentional prosecutorial misconduct.

Nevertheless, the trial judge's failure to order a mistrial is probative on the issue of whether intentional prosecutorial misconduct actually took place. The trial judge in this case was well aware of the difficulties experienced in securing Harvey Webb to testify and knew of the defense counsel's charge that the prosecution had concealed Webb from the defense. The trial judge had also listened to all the testimony and could evaluate how damaging Webb's testimony was to the State's case. Most importantly, the trial judge actually witnessed the State's cross-examination of Webb. All of these circumstances placed the trial judge in an excellent position to determine whether the prosecutor had the intention to provoke a mistrial with his cross-examination of Webb. The trial judge, by failing to declare a mistrial, implicitly determined that the prosecution did not have any such intent. This implicit determination, especially when considered in light of the petitioner's failure to move for a mistrial based on the cross-examination of Webb, militates strongly in favor of a finding that the prosecution did not intend to cause a mistrial. *See United States v. Curtis*, 683 F.2d 769, 777 (3rd Cir.) ("In view of the failure of both the defense counsel and the trial judge to recognize immediately the need for a mistrial, it is difficult to credit the premise that the prosecutor could not have committed such conduct without knowing and intending that a mistrial would result."), *cert. denied*, 459 U.S. 1018, 103 S.Ct. 379, 74 L.Ed.2d 512 (1982).

Another factor strongly supporting a finding that the prosecution did not intend to cause a mistrial is the strength of the State's case. *See United States v. Weeks*, 870 F.2d 267, 269 (5th Cir.), *cert. denied*, — U.S. —, 110 S.Ct. 92, 107 L.Ed.2d 57 (1989). As more fully detailed in the FACTS section of this opinion, the evidence of petitioner's guilt in this case was overwhelming. John Brender, a disinterested party who lived in the vicinity of the murder, testified that shortly after the shooting took place he saw petitioner exit the passenger side of a maroon Camaro with a rifle. A police officer testified that he stopped petitioner in the area of the murder shortly after the shooting occurred. Petitioner and Kenny both gave incriminating statements to law enforcement officials after their arrests, and their co-conspirator, Galason, testified against them. Galason's description of the events surrounding the murder substantially coincided with the statements given by petitioner and Kenny, and Galason's story was further supported by the physical evidence. A case with this type of incriminating evidence is hardly one in which it behooves the prosecutor to try to get a mistrial.

Armed with such a strong case, there is simply no rational explanation for the prosecutor's cross-examination of Webb. The prosecutor clearly should have known that his examination was wholly improper and, if he had thought about it, he would have realized that such conduct would result in a mistrial or reversal. However, this court finds that the prosecutor did not stop to think through the consequences of his actions, much less commit them with the hope of obtaining a mistrial. After reviewing the record in this case, this court agrees with Judge Schreier that the prosecutor's conduct was the result of emotional, heated animus between the prosecutor and Webb and the prosecution and the defense.

Throughout the trial, fiery exchanges occurred between the prosecution and the defense attorneys. At several points during the trial, the trial judge was apparently at a loss to control the outbursts of attorneys for both the prosecution and the defense. In attempt to preserve some decorum, the judge frequently ordered the attorneys to sit down and admonished them

a mistrial. *See United States v. Head*, 697 F.2d 1200, 1206 & n. 10 (4th Cir.1982), *cert. denied*, 462 U.S. 1132, 103 S.Ct. 3113, 77 L.Ed.2d 1367 (1983). In that instance, defendant has not

even performed the minimal act within his power to help the trial court recognize that a mistrial should be declared.

about speaking out of turn or improperly arguing amongst themselves instead of addressing the court. This emotional tension came to a head during the cross-examination of Harvey Webb. One exchange is particularly representative of the emotional, somewhat chaotic atmosphere which pervaded the trial at the time of the cross-examination of Webb. In the middle of the prosecution's cross-examination of Webb, the judge called a side bar, at which time he stated:

> I should like to remind counsel, number one, that this is a courtroom. This is a very serious proceeding. It is entitled to all of the dignity that we can afford or that we can give as professionals ... [and] the Court intends to enforce the duties upon the attorneys to keep the quietude of this place and the professionalism that you should, of course, by coming into this court exhibit. Now, there have been some turbulent exchanges here.... I excused the jury from the room for the purposes of settling it down a little bit. If you have objections at this time you will take them up with the Court one by one. You will be seated except for the person that is speaking or addressing the Court.

Trial transcript at 1519. After this admonishment, Kenny's attorney expressed objections to what he perceived were "harassment" "innuendo" and "smear" tactics used by the prosecution on cross-examination. When the judge asked the prosecutor for his response to those objections, the prosecutor replied, "[Webb] started it. I didn't start it." Trial transcript at 1521. Clearly, these are not the words of a prosecutor planning to intentionally secure a mistrial. These words are the childish response of a prosecutor who has simply allowed his emotions to get the best of him.

In no way does this court condone the actions of the prosecutor in this case; in fact, this court finds the prosecutor's conduct quite disturbing, and certainly deserving of reversal. Under *Kennedy*, however, petitioner cannot prevail unless he demonstrates that the prosecution committed misconduct with the intent to cause a mistrial.

Based on the record in this case, this court cannot make such a finding.

### CONCLUSION

For the foregoing reasons, the court finds ample evidence in the record to support Judge Schreier's factual determination that the state prosecutors in petitioner's 1983 murder trial did not commit misconduct with the intent to cause a mistrial. Accordingly, the petition for habeas corpus is denied.

IT IS SO ORDERED.