Docket No. 97958–Agenda 6–January 2005.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. ERIC L. HART, Appellee.

Opinion filed April 7, 2005.

JUSTICE KARMEIER delivered the opinion of the court:

Defendant, Eric Hart, was charged in the circuit court of Macon County with armed robbery and aggravated fleeing or attempting to elude a police officer, pursuant to section 18–2(a) of the Criminal Code of 1961 (720 ILCS 5/18–2(a) (West 2000)) and section 11–204.1 of the Illinois Vehicle Code (625 ILCS 5/11–204.1 (West 2000)). A jury found defendant guilty of both offenses, and defendant was subsequently sentenced to concurrent terms of 20 and 3 years’ imprisonment, with credit for 369 days time served. Defendant appealed, arguing he was denied a fair trial when the prosecutor elicited testimony that he attempted to plea bargain and commented on that attempt in closing argument. With one justice dissenting, the appellate court agreed, reversing defendant’s convictions. 345 Ill. App. 3d 822. We allowed the State’s petition for leave to appeal (177 Ill. 2d R. 315(a)), and we now reverse the judgment of the appellate court.

BACKGROUND

Defendant was found guilty at the conclusion of a two-day jury trial. We summarize the evidence elicited and the arguments advanced during defendant’s trial to the extent necessary to understand the issues presented.

Brian Nash testified he was working at a Clark Oil gas station located at Oakland Avenue and Ravina Park Road in Decatur, Illinois, at approximately 5:30 a.m. on May 20, 2001, when a man came in wearing pantyhose over his head and robbed Nash at gunpoint. The robber directed Nash to open the cash register and give him the money. Nash complied, handing the man an unspecified amount of money in denominations of $1 and $5 dollar bills. After the man left, Nash called the police. Nash described the robber as a black male in his twenties, approximately 5 feet 11 inches tall, weighing about 160 to 180 pounds, and wearing a black or blue Starter shirt and blue jeans. The police arrived within a minute of his call, and Nash gave them a general description of the robber. Subsequently, Nash was taken to the location where a suspect had been arrested and identified the clothing the suspect was wearing as that worn by the robber. Because of the pantyhose the robber wore on his head, Nash had not seen the robber’s face. Nash later gave the police the gas station’s video camera surveillance tape. That tape was subsequently admitted as evidence. Nash identified a handgun found outside the station as the one used by the perpetrator.

Decatur police officers Toby Williams and Steve Young testified regarding their pursuit and eventual apprehension of defendant. Officer Williams stated that he received a description of the robber over his radio and observed defendant, who matched that description, driving in the opposite direction on Home Park Avenue near Ramsey. The location described is about midway on Home Park between Ravina Park Road and Division Street. Williams turned his car around and followed defendant. At some point, Williams was joined by Officer Young, who had first encountered defendant at the intersection of Home Park and Center Street. When the officers activated their emergency lights, defendant’s car accelerated. In the course of the pursuit, defendant’s vehicle reached estimated speeds of between 50 and 70 miles per hour in an area with a posted speed limit of 30 miles per hour. Ultimately, defendant lost control of his vehicle and ran up into the yard of a residence, coming to rest against a downed tree. Defendant got out of the car and started running, but was quickly caught and, after brief resistance, was taken into custody. Defendant had two $5 bills and six $1 bills on his person.

Officers Lonnie Lewellyn and Brian Kaylor testified that they drove Nash to the location where defendant was apprehended and, though Nash could not positively identify the defendant because the robber had worn pantyhose over his head, Nash 
did
 say that defendant had the same build and clothing as the offender. At trial, Kaylor identified the clothing worn by defendant: a pair of blue jeans, a black long-sleeved T-shirt with a Starter logo on the front, a white T-shirt, and black tennis shoes. The clothing worn by defendant when he was arrested matched that worn by the robber as seen on the station’s surveillance video tape. Officer Lewellyn inventoried the contents of defendant’s vehicle and found, on the driver’s side floorboard, a pellet gun and $132 in loose currency. Officers Lewellyn and Steve Jostes searched the area around the gas station and recovered a pair of nylon stockings and a .22-caliber pistol in a grassy area nearby. No identifiable fingerprints were found on the handgun.

Former Decatur police detective Michael Beck testified that he interviewed defendant on May 20, 2001, at the Macon County jail. Beck advised defendant of his rights, and defendant “agreed to make a statement.” Beck said: “He told me initially that he found out when he was arrested he had a warrant on file that he thought had been taken care of.” Beck then told defendant the reason he was there was to interview defendant about an armed robbery and he knew defendant was involved. Beck stated:

“He did not deny being involved but asked me what I could do for him if he cooperated. I advised him at that time I couldn’t make any promises to him if he cooperated; however, I would contact the State’s Attorney’s Office and advise them of his cooperation.”

No objection was interposed to the foregoing testimony. Beck testified defendant then asked to make a phone call to his mother. Beck stepped out of the room for a moment so defendant could talk to his mother in private, and, after a short time, reentered the room and spoke to defendant’s mother, explaining defendant’s circumstances. Defendant indicated he wanted to pray with his mother, which he did. Afterward, defendant said he wanted to think about whether he wanted to talk to Beck or not and advised Beck he would notify him if he wished to make a statement. Beck said he never heard from defendant again.

On cross-examination, Beck acknowledged that defendant had not admitted to being involved in the robbery. Defense counsel then asked, “He just said he was thinking about making a statement to you?” Beck reiterated: “What he said was, he asked me what I could do for him if he cooperated and I told him and he made no other statement regarding that.” Prior to concluding his cross-examination, counsel sought to further clarify for the jury the extent to which defendant might have implicated himself:

“Q. He hasn’t made a statement one way or the other concerning his involvement or non-involvement with this robbery. Is that correct?

A. That is correct.”

Defendant presented an “alibi” defense. Defendant’s girlfriend, Jennifer O’Neil, testified that she lived in Decatur, and defendant often spent the night at her residence. O’Neil stated that defendant stayed at her house on the evening of May 19, 2001, and got up the next morning at 5:30 a.m., “as usual.” However, she did not know when he left her residence that day. Defendant’s mother testified that he “normally” came to her house “three or four” mornings a week to feed her dogs.

Defendant testified that he stayed at O’Neil’s residence the night of May 19, 2001, and got up around 5 or 5:30 a.m. on the morning of May 20. At some time unspecified, defendant left O’Neil’s residence in his 1984 Oldsmobile. Defendant stated he was en route to his mother’s house when the police started following him. After about a block, they activated their lights. Defendant admitted he “kept going.” He said he fled because he “didn’t have [a] license” and “had a warrant.” Defendant also claimed he knew he was going to be arrested, and he was trying to make it to the house of an acquaintance because he “didn’t want the car to get towed away off the side of the road..”

According to defendant, his vehicle was struck from behind during the police chase, which caused him to lose control of the vehicle. He then hit a mailbox and his vehicle came to rest on a log in someone’s front yard. Defendant said he knew he was going to be arrested, and he was scared, so he jumped out of the car and ran. He was apprehended a short distance away.

Defendant admitted he owned the “BB gun” found on the floor of his car. He further acknowledged there were numerous bills in $1 and $5 denominations seized upon his arrest, though he stated the money was on his person, not in his car. Defendant addressed the presence of numerous $1 and $5 bills, saying they were the fruits of his employment as a barber. He said he charged $5 for a child’s haircut and $8 for an adult.

On cross-examination, defendant insisted he had $148, in small denominations, folded up in his back pocket at the time of his arrest. He maintained that he received that money for cutting hair. The following exchange then ensued between the prosecutor and the defendant.

“Q. Whose hair did you cut the day before?

 A. That was so long ago. I mean, I can’t tell you exactly, but–uh–I mean, there’s a lot of people hair [
sic
] that I cut. That’s probably from a whole week’s cuts, probably.

Q. Going back to this–uh–was the 20th, the 19th, whose hair did you cut?

A. Cut couple of bunches’ hair. Some kids’ hair.

Q. How many?

A. I can’t remember how many I cut that day.

Q. How many kids? How many adults?

A. I can’t remember how many I cut that day.”

Defendant was also asked what route he took to his mother’s house on the morning of May 20. Defendant described a circuitous route that actually took him in the opposite direction from his mother’s house for a 
significant
 distance. Looking at a map of Decatur that was admitted as an exhibit, it appears the route defendant described would have unnecessarily doubled the distance to his mother’s residence and would have constituted a nonsensical detour. According to defendant, he was headed south when he turned off of Oakland–which would have taken him directly to his mother’s house–and traveled several blocks west on Division Street, before turning south on Home Park, intending to go several blocks south, before turning back east and going several blocks back to Oakland. Defendant did not explain why he would have taken such a route. The route he described did, however, supply an explanation why he was on the other side of Decatur, on Home Park Avenue, when he was first spotted by police officers. Home Park Avenue intersects with Ravina Park Road–where the Clark station was located.

On redirect examination, defense counsel asked defendant about the police chase that ended in his apprehension:

“Q. How fast were you going after the police–uh–tried to pull you over?

A. I never did speed from the police officers. I never went over the speed limit.

Q. Okay.

A. And they–I mean, they know that. They made fun about that when they arrested me on the scene. Couple of police officers that was laughing about it; where did he think he was going? He didn’t know I knew somebody. If they had let me go, I would have parked the car in her driveway. Dead end area. She been living back there for over 30-some years.”

After defendant testified, Officer Lewellyn was recalled to identify, on the Decatur street map, the street upon which defendant’s girlfriend lived, and that upon which defendant’s mother lived. With that, the evidentiary portion of the case was concluded. The aforementioned street map was admitted as evidence, as was the gas station’s surveillance video tape, capturing the robbery in progress.

During closing argument, defense counsel noted that defendant did not make an admission to Detective Beck, that the only thing defendant said was that he wanted to pray. The prosecutor subsequently argued:

“The defendant, also, mentioned the fact that he wanted to pray [with] his mother is not an indication of guilt, but you remember what Officer Beck told you? He didn’t just want to pray with his mother. He wanted to know what he would get or what kind of compensation or what kind of agreement or whatever he would get if he cooperated. And, [l]adies and [g]entlemen, only guilty men want to know what they get if they cooperate.”

Defense counsel did not object to the prosecutor’s comments.

The jury was instructed in the applicable law, including admonitions that closing arguments are limited to reasonable inferences to be drawn from the evidence and are not themselves evidence. During deliberations, the jury again viewed the gas station’s security videotape which had captured the robbery in progress. The jury subsequently found defendant guilty of armed robbery and aggravated fleeing or attempting to elude a police officer. Defense counsel did not raise Beck’s testimony or the prosecutor’s closing argument as issues in a posttrial motion. Defendant was subsequently sentenced to concurrent terms of 20 and 3 years’ imprisonment.

In the ensuing appeal, defendant argued he was denied a fair trial when the prosecutor–according to defendant–elicited testimony that he attempted to “plea bargain” and commented on that attempt in closing argument. The appellate court acknowledged that defendant had not properly preserved the issue, but considered the allegation of error under the plain error rule.

The court, with one justice dissenting, held the prosecutor’s comment improper and sufficiently egregious to warrant reversal. The majority recognized that care should be exercised in excluding, pursuant to Supreme Court Rule 402(f) (177 Ill. 2d R. 402(f)), a defendant’s admissions to police investigators, noting that 
every 
“guilty person who voluntarily speaks to a detective probably hopes to benefit from the conversation, either by convincing the detective that he did not commit the crime or by obtaining leniency for his cooperation.” 345 Ill. App. 3d at 825. The court agreed that “factual admissions” should not be excluded “on the basis of a mere intention on the part of the accused to help himself by cooperating with the police.” 345 Ill. App. 3d at 825. However, the majority observed this case does not involve a factual admission. Rather, it involves what the majority characterized as the prosecutor’s suggestion to the jury that defendant “offered to enter into 
plea negotiations 
and that offer was an indication of guilt.” (Emphasis added.) The appellate majority cited this court’s decision in 
People v. Friedman
, 79 Ill. 2d 341, 352 (1980) for the proposition that “[t]he use of technical objections in an attempt to establish that defendant’s inquiries have not risen to the level of a ‘plea discussion’ has been rejected by the supreme court.” The appellate court implicitly concluded that defendant had clearly indicated his intent to pursue plea negotiations (345 Ill. App. 3d at 826-27) and stated its belief that the prosecutor’s argument regarding defendant’s willingness to cooperate ran “counter to the whole idea of Rule 402(f).” 345 Ill. App. 3d at 827. The court noted its “further concern” over Detective Beck’s testimony that defendant was silent in the face of Beck’s accusation of guilt; however, the court failed to specify how and if that concern figured into its decision to reverse defendant’s conviction, which was avowedly based upon the appellate majority’s perception of a Rule 402(f) violation.

In dissent, Justice Myerscough pointed out that the majority had ignored various appellate court precedents that appeared to dictate a different result, holding similar statements admissible where they were not clearly plea related. 345 Ill. App. 3d at 828 (Myerscough, J., dissenting (citing 
People v. Rolih
, 233 Ill. App. 3d 484 (1992), 
People v. Ward
, 192 Ill. App. 3d 544 (1989), 
People v. Burns
, 188 Ill. App. 3d 716 (1989), and 
People v. Tennin
, 123 Ill. App. 3d 894 (1984)). Justice Myerscough suggested the majority had mischaracterized the prosecutor’s remarks: “[T]he prosecution simply commented that defendant asked what the police officer ‘could do for him if he cooperated,’ more precisely, what benefits could defendant derive 
if he cooperated
–
not if he pleaded guilty.
” (Emphasis in original.) 345 Ill. App. 3d at 829 (Myerscough, J., dissenting). Justice Myerscough believed the prosecutor’s comment constituted permissible rebuttal to defense counsel’s assertion in closing that defendant “didn’t make an admission to Detective Beck.” Justice Myerscough concluded:

“Defendant clearly opened the door, and the prosecutor could properly respond to defense counsel’s comments and draw reasonable inferences therefrom. Moreover, it is inconsistent to allow defense counsel to fail to object to Beck’s testimony at trial, to comment on the testimony in his closing argument, and then to argue on appeal that the prosecutor improperly used that testimony in his rebuttal argument.” 345 Ill. App. 3d at 830 (Myerscough, J., dissenting).

Before this court, the State argues that the defendant’s statement to Detective Beck was not plea related and was, therefore, admissible at trial. Consequently, the prosecutor’s reference to that statement in closing argument was both proper and invited by defendant’s closing argument. Defendant counters that Rule 402(f) was violated, and his right to a fair trial was compromised, by Detective Beck’s testimonial comment on defendant’s post-
Miranda 
silence and his “attempt to pursue plea negotiations.” Defendant contends the error was magnified when the prosecutor argued in closing, “only guilty men want to know what they get if they cooperate.”

ANALYSIS

Initially, we note, as did the justices of the appellate court, that defendant neither objected to the evidence or prosecutorial comments in question at the time of trial, nor raised issues relating thereto in a post-trial motion. However, the appellate court excused the default, under the plain error rule, holding that the prosecutor’s violation of Rule 402(f) denied defendant a fair trial. 345 Ill. App. 3d at 824-27. We disagree with the appellate court.

Our purpose in promulgating Supreme Court Rule 402(f) was to encourage the negotiated disposition of criminal cases by eliminating the risk that juries will hear statements or admissions made by defendants during plea negotiations. 
Friedman
, 79 Ill. 2d at 351. To that end, Rule 402(f) provides:

“If a plea discussion does not result in a plea of guilty, *** neither the plea discussion nor any resulting agreement, plea, or judgment shall be admissible against the defendant in any criminal proceeding.” 177 Ill. 2d R. 402(f).

Our rule is similar to the previous version of Rule 410 of the Federal Rules of Evidence, which provided in pertinent part:

“Except as otherwise provided in this rule, evidence of *** an offer to plead guilty or nolo contendere to the crime charged or any other crime, or of statements made in connection with, and relevant to, any of the foregoing *** offers, is not admissible in any civil or criminal proceeding against the person who made the *** offer.” Fed. R. Evid. 410.

Rule 410 has now been changed so as to require–for purposes of exclusion–that the statement be made “in the course of plea discussions 
with an attorney for the prosecuting authority
.” (Emphasis added.) Fed. R. Evid. 410. But see 
United States v. Grant
, 622 F.2d 308 (8th Cir. 1980) (extending coverage under the rule to statements made to law enforcement agents who have express authority to act for the prosecuting government attorney). However, when this court rendered its decision in 
Friedman
, we noted the then-existing similarities between the state and federal rules when we recognized the need to establish decisional boundaries “in relation to the reasonable expectations of the accused at the time the statement was made.” 
Friedman
, 79 Ill. 2d at 351. To that end, this court cited, approvingly, the decision of the federal court in 
United States v. Robertson
, 582 F.2d 1356, 1366 (5th Cir. 1978), and adopted the two-part test utilized in that case to determine whether a particular statement is plea related. Pursuant to that test, courts must consider, first, whether the accused exhibited a subjective expectation to negotiate a plea, and, second, whether that expectation was reasonable under the totality of the objective circumstances. 
Friedman
, 79 Ill. 2d at 351. This court stated: “Because of the substantial similarity in the purpose of the Federal rules, we find this analysis equally applicable to the determination of when a statement is plea related under our rule.” 
Friedman
, 79 Ill. 2d at 351.

 This court further observed: “Before a discussion can be characterized as plea related, it must contain the rudiments of the negotiation process, 
i.e.
, a willingness by defendant to enter a plea of guilty in return for concessions by the State.” 
Friedman
, 79 Ill. 2d at 353. To illustrate that point, this court invited a comparison of 
United States v. Pantohan
, 602 F.2d 855 (9th Cir. 1979), 
United States v. Levy
, 578 F.2d 896 (2d Cir. 1978), and 
United States v. Robertson
, 582 F.2d 1356 (5th Cir. 1978), with 
United States v. Brooks
, 536 F.2d 1137 (6th Cir. 1976), and 
United States v. Smith
, 525 F.2d 1017 (10th Cir. 1975). Examination of those cases is instructive for present purposes.

In both 
Smith 
and 
Brooks
, it was held that the rudiments of the negotiation process were present, and exclusion of plea-related statements was thus mandated. In 
Smith
, defendant informed an interrogating officer that he “wanted to talk *** about *** making a deal.” Defendant indicated he would enter a plea of guilty to federal charges so long as he could spend his period of incarceration in a federal, rather than state, facility. 
Smith
, 525 F.2d at 1019-20. The 
Smith 
court concluded that the foregoing statements were indicative of plea bargaining. 
Smith
, 525 F.2d at 1022. In 
Brooks
, defendant telephoned a postal inspector and offered to plead guilty to certain charges if he were given a maximum sentence of two years. 
Brooks
, 536 F.2d at 1138. The 
Brooks 
court noted that offers to plead guilty are “generally considered a part of plea negotiations and are ordinarily inadmissible.” 
Brooks
, 536 F.2d at 1138. The 
Brooks 
court stated that “even an attempt to open plea bargaining (which is what we have in this case) should be covered under the *** rule of inadmissibility.” 
Brooks
, 536 F.2d at 1139. The court’s opinion suggested a harmless error analysis might have been appropriate, but the court could not “say that admission of appellant’s offer was harmless.” 
Brooks
, 536 F.2d at 1140.

When one compares 
Brooks 
and 
Smith 
with 
Pantohan
, 
Levy
, and 
Robertson
, it becomes clear that this court never intended Rule 402(f) to exclude as evidence mere offers to cooperate with the police, at least where the offers were not accompanied by “the rudiments of the negotiation process,
 i.e.
, a willingness by defendant to enter a plea of guilty in return for concessions by the State.” See 
Friedman
, 79 Ill. 2d at 353.

In 
Pantohan
, defendant confessed to the crime of which he was accused and cooperated with federal agents to the extent of providing general information regarding the criminal activities of others. He was told that the prosecutor would be told of his cooperation, but the information was never communicated to the prosecutor. Defendant subsequently argued that his statements to the agents should have been suppressed, as they were made during plea bargaining. The court of appeals rejected that contention, stating:

“Pantohan apparently felt that cooperating with the ATF agents was ‘the only way out.’ However, he knew that he was not under arrest at the time of the statements, there was no ‘promise’ other than to tell the United States Attorney of the cooperation, and there was no plea offer[,] no plea bargaining. Since the statements were not made during plea negotiations, they do not require suppression.” 
Pantohan
, 602 F.2d at 857.

In 
Robertson
, defendant Robertson and his codefendant, Butigan, were arrested on drug charges and, shortly thereafter, offered to cooperate with federal agents in exchange for the release of, or leniency for, their female companions, who had also been arrested. Robertson and Butigan were told only that their cooperation would “probably help *** out in the long run” and that the agents would “make it known to the Judicial Authorities.” Pursuant to their offer of cooperation, Robertson and Butigan then admitted their own involvement and stated emphatically that the women were not involved. 
Robertson
, 582 F.2d at 1359-61. Robertson later claimed that his conversations with the agents constituted plea negotiations. The court of appeals rejected that contention. The court observed:

“[A]pplication of Fed. R. Crim. P. 11(e)(6) and Fed. R. Evid. 410 to circumstances such as those presented in this case would have a substantial adverse effect on important law enforcement interests. It is reasonable to assume that the cooperation of an arrested person often is prompted by a desire for leniency for himself or others. Statements or confessions made in such circumstances, if they are voluntary and made with full awareness of the person’s rights, are reliable, probative and constitutionally admissible evidence. See 18 U.S.C.A. §3501. We do not believe that Fed. R. Crim. P. 11(e)(6) and Fed. R. Evid. 410 require otherwise.” 
Robertson
, 582 F.2d at 1368.

The court determined that Robertson’s conversation with the agents was not a plea negotiation, noting there was “no indication in the record that [defendants] were willing to plead guilty or even offer to plead guilty to exonerate the women.” 
Robertson
, 582 F.2d at 1370. The 
Robertson 
court concluded: “Statements such as these should not be rendered inadmissible simply because the individual expresses a desire to be cooperative in return for leniency for another.” 
Robertson
, 582 F.2d at 1371.

Levy
 is even more to the point. Following his arrest on narcotics charges, Levy offered to cooperate with federal agents and, in the course of the conversations, volunteered various incriminating statements. He subsequently contended that his offers to cooperate, and the attendant incriminating statements, were inadmissible under the version of Rule 410 then in effect–the version which this court in 
Friedman 
found similar to our own Rule 402(f). The 
Levy 
court rejected defendant’s contention. First, the court spoke to the issue of relevance, stating:

“There was testimony *** concerning offers by Levy to cooperate in the future. Agents White, DiGravio, and Day each testified that Levy had offered to cooperate with the DEA in future investigations. We think that such an offer evidences a consciousness of guilt and is relevant to prove the charge against Levy.” 
Levy
, 578 F.2d at 900.

The court then examined the circumstances surrounding the statements in question and concluded:

“Levy made his offers of cooperation and attendant admissions without attaching any condition to his admissions. The agents did not initiate the discussion. See ABA, 
Minimum Standards for Criminal Justice, Standards Relating to Pleas of Guilty 
§3.4 at 78 (1968). Rather, he volunteered to cooperate in the absence of any request from the agents. His decision to offer his cooperation was spontaneous, apparently based upon a successful prior experience of his own.

No fault can be found with allowing in evidence his volunteered desire to cooperate in the future, since it was evidence of his consciousness that he was in serious difficulty with the law and needed to do something to extricate himself. We glean nothing from Levy’s various conversations that is fairly discernible as an offer of a bargain. Nor were the admissions that were made concurrently with the offer immunized from use, since there was no offer to plead guilty on condition that the charges or the possibility of maximum punishment would be reduced.” 
Levy
, 578 F.2d at 901-02.

In 
Friedman
, this court utilized 
Brooks
,
 Smith
,
 Pantohan
, 
Robertson
, and 
Levy
 to illustrate the difference between cases exhibiting the rudiments of plea bargaining (
Brooks 
and 
Smith
) and those in which the requisites of plea bargaining were lacking (
Pantohan
, 
Robertson
, and 
Levy
). This court thus placed an implicit imprimatur on the analysis employed in the latter federal decisions which, generally, stand for the proposition that offers to cooperate, without more, do not constitute plea negotiations or offers to enter into plea negotiations. Illinois appellate court panels, confronted with similar facts, have since reached results consistent with the federal decisions cited in 
Friedman
.

For example, in 
People v. Beler
, 327 Ill. App. 3d 829 (2002), defendant was arrested for, 
inter alia
, possession of cocaine with intent to deliver, and was subsequently approached by a detective seeking defendant’s cooperation in either revealing his supplier or participating in a controlled buy. At trial, the prosecutor elicited testimony from the detective indicating that defendant had agreed to cooperate. During closing argument, the prosecutor stated, “ ‘[d]efendant was beginning to attempt to cooperate with the drug investigation *** in this case. Again, it’s overwhelming, obvious evidence of [d]efendant’s knowledge.’ ” 
Beler
, 327 Ill. App. 3d at 832. Defendant was convicted and appealed, arguing that the detective’s testimony constituted evidence of plea negotiations inadmissible pursuant to Rule 402(f) (177 Ill. 2d R. 402(f)). The appellate court disagreed, noting that defendant “did not express an interest in confessing, pleading guilty, or seeking concessions from the State in exchange for a plea.” 
Beler
, 327 Ill. App. 3d at 834. In short, “ ‘the rudiments of the negotiation process’ ” were not present. 
Beler
, 327 Ill. App. 3d at 834, quoting 
Friedman
, 79 Ill. 2d at 353. Notably, Beler did not raise the quoted remark of the prosecutor as error or argue that the inference therein was improper.

Similarly, in 
People v. Rolih
, 233 Ill. App. 3d 484 (1992), a defendant arrested for possession of narcotics indicated he “wished to cooperate in any way possible for future consideration of the charges that would be pending against him” and he “would do anything to assist [the police] which would in turn assist him with–in consideration of the charges.” Defendant made other incriminating statements both at the time of his arrest and subsequently at police headquarters. Defendant was later released on the night of his arrest “due to his offer of cooperation.” 
Rolih
, 233 Ill. App. 3d at 486. After the trial court found defendant guilty, defendant filed a posttrial motion, arguing that the court had erred in considering “plea-related statements.” The court ruled that the statements at issue were not plea related and were properly admitted. 
Rolih
, 233 Ill. App. 3d at 488. We note, in passing, that the prosecutor, at one point in the trial, specifically argued that defendant’s willingness to cooperate “was evidence of consciousness of guilt.” 
Rolih
, 233 Ill. App. 3d at 487. The appellate court held that the statements were properly admitted, stating:

“The rudiments of a negotiated plea are lacking here. Defendant did not explain what he meant by the terms ‘cooperation,’ ‘future consideration of the charges,’ and ‘in consideration of the charges.’ These words do not manifest that defendant was willing to plead guilty to the charges against him. He did not indicate what the terms were under which he would be willing to bargain. *** Accordingly, we find no error in admission of defendant’s statements.” 
Rolih
, 233 Ill. App. 3d at 489.

Finally, in 
People v. Ward
, 192 Ill. App. 3d 544 (1989), a defendant arrested for residential burglary told an interrogating officer he knew a lot of narcotics dealers and would like “to work this off.” The officer responded that the police could not make any deals, and the only thing he could do was to tell the State’s Attorney that defendant had cooperated. Defendant later admitted he made the statement because he wanted to go home. 
Ward
, 192 Ill. App. 3d at 546. During closing argument, the prosecutor stated as follows:

“ ‘And when Detective Strickland, after talking for a while, finally says Karen Gilbert wasn’t asleep, she saw you as you walked by that couch, she identified you, what does [defendant] do? What does he do? He slumps, the head goes down. He says let’s make a deal. Let me work this through. I know drug dealers. Let’s make a deal, ladies and gentlemen. Make a deal for what? His instinctive reaction when he knew he was caught was to try and make a deal.’ ” 
Ward
, 192 Ill. App. 3d at 549.

Later, in rebuttal argument, the prosecutor stated:

“ ‘I submit, ladies and gentlemen, if you didn’t commit the offense, you would not jump at the point where you’ve been told you were identified and say, hey, let’s make a deal. No. You’d say she’s wrong, something along those lines, but not let’s make a deal, let me work this off, I know some drug dealers.’ ” 
Ward
, 192 Ill. App. 3d at 546.

The appellate court affirmed the resulting conviction after a thorough review of other cases addressing Rule 402(f) issues, concluding that defendant’s statement was not plea related and was properly admitted. 
Ward
, 192 Ill. App. 3d at 553. The court held that defendant’s use of the ambiguous phrase “work this off” did not sufficiently demonstrate that defendant was initiating plea discussions. The court observed, “[I]t is just as compelling to conclude from the record that he was attempting to trade information about narcotics dealers for the dropping of the charge against him [citation] or that he just wanted to go home, as defendant himself admitted.” 
Ward
, 192 Ill. App. 3d at 554. Ward apparently did not raise the quoted remarks of the prosecutor as error or argue that the inferences therein were improper.

The foregoing cases obviously do not represent an all-inclusive recitation of arguably applicable cases and factual scenarios. However, we believe the relevant circumstances in these cases parallel the critical facts in the case at bar. See also 
People v. Ramirez
, 244 Ill. App. 3d 136, 146-47 (1993) (court held defendant’s offer to cooperate with the police, out of fear of incarceration, was not a plea-related statement and was thus admissible); 
People v. Burns
, 188 Ill. App. 3d 716, 719 (1989) (defendant’s statements to the arresting officer that “he could help out” and could “do in someone in Wisconsin” so long as he were not “thrown in jail” could not be characterized as plea negotiations and were therefore admissible). But see 
People v. Ragusa
, 346 Ill. App. 3d 176, 186-87 (2004) (where the 
police
 apparently offered 
defendant
 the opportunity to cooperate in exchange for a reduction in charges, the appellate court (with very limited analysis) affirmed the trial court’s ruling that defendant’s statements were plea related).

We acknowledge numerous other appellate decisions involving facts differing to a greater or lesser degree from those with which we are confronted in this case. What is apparent from a review of those cases is that a defendant’s reference to “making a deal,” or his inquiry as to what would happen if he “pleaded no contest,” can make the analysis more problematic. See generally 
People v. Taylor
, 289 Ill. App. 3d 399, 402-04 (1997) (defendant’s hypothetical question–“if [I] went to court and would plead no contest *** what would happen[?]”–merely demonstrated that defendant was seeking information, and did not contain the rudiments of the negotiation process); 
People v. Connolly
, 186 Ill. App. 3d 429, 436 (1989) (defendant’s inquiry as to whether deals could be made was held to be plea related and inadmissible at retrial, despite the appellate panel’s acknowledgment that the statement “was not so clearly a demonstration of defendant’s willingness to bargain”); 
People v. Tennin
, 123 Ill. App. 3d 894, 896 (1984) (defendant’s statement, “I want to make a deal,” was not plea related and therefore not violative of Rule 402(f)); 
People v. Victory
, 94 Ill. App. 3d 719, 723 (1981) (defendant’s statement to an officer held admissible and not plea related despite defendant’s offer to accept a 10-year sentence and his contemporaneous inquiry as to whether the State’s Attorney would be willing to plea bargain). We express no opinion regarding the outcomes or analyses of these cases, which addressed facts significantly different from those in the case before us.

In the instant case, defendant suggested he might be willing to cooperate with Detective Beck, but he wanted to know what 
Beck 
could do for him. He did not ask what concessions the 
prosecutor 
might offer him. He did not ask Beck to initiate contact with the State’s Attorney’s office or convey terms to the prosecutor. He did not state what his “cooperation” might entail or specify what, if anything, he would require in exchange for his cooperation. He never intimated that he was willing to plead guilty or 
discuss
 pleading guilty. In short, the rudiments of the negotiation process are not present. For all practical purposes, this case is indistinguishable from cases like 
Levy
, and we believe the same result is indicated: the evidence in question does not violate Rule 402(f) and is thus admissible.

The fact that defendant did not inquire further after Beck informed defendant he would do nothing more than advise the State’s Attorney of defendant’s cooperation does not, in our opinion, “exhibit[ ] a subjective expectation” (
Friedman
, 79 Ill. 2d at 351) that defendant was seeking to negotiate a plea. Moreover, even 
if 
we assume, 
arguendo
, that defendant’s subjective expectation was not clear, defendant’s argument would nonetheless fail because that expectation was not reasonable under the totality of the objective circumstances. See 
Friedman
, 79 Ill. 2d at 351.

Defendant, however, suggests that the prosecutor’s rebuttal argument “eradicated” any doubt that Beck’s testimony was being used in violation of Rule 402(f). The appellate majority expressed essentially the same view when it characterized the prosecutor’s rebuttal as a suggestion to the jury that defendant “inquired about the possibility of a plea negotiation” and concluded that the prosecutor’s argument regarding defendant’s willingness to cooperate ran “counter to the whole idea of Rule 402(f).” 345 Ill. App. 3d at 827. We disagree in all respects.

First, the prosecutor never stated or implied that defendant offered to enter into “plea negotiations” or “plead guilty,” which is what Rule 402(f) is intended to prohibit. The prosecutor stated in pertinent part that defendant “wanted to know what he would get or what kind of compensation or what kind of agreement or whatever he would get if he cooperated.” As our previous discussion of relevant cases indicates, a defendant might choose to offer cooperation to a police officer for a variety of reasons; however, without a reasonably specific reference to a defendant’s willingness to either negotiate or enter a guilty plea, neither evidence of a defendant’s willingness to cooperate, nor prosecutorial comments thereon, violate Rule 402(f) as currently constituted. Indeed, in 
Levy
, one of the exemplary cases this court cited in 
Friedman
, the court of appeals specifically stated:

“We think that such an offer [of cooperation] evidences a consciousness of guilt and is relevant to prove the charge against Levy.” 
Levy
, 578 F.2d at 900.

There is no reason why the prosecutor could not argue an inference properly drawn from relevant and admissible evidence. The law gives a prosecutor wide latitude in argument and he may comment on facts and legitimate inferences that may be drawn therefrom. 
People v. Williams
, 192 Ill. 2d 548, 573 (2000). Neither the testimony elicited, nor the prosecutor’s comment thereon, violated Rule 402(f).

We find no error, much less plain error. We therefore hold that the issue is procedurally defaulted and that no basis exists to excuse the default under our caselaw. See 
People v. Keene
, 169 Ill. 2d 1, 17 (1995) (recognizing that when plain error is lacking, “the procedural default must be honored”).

We turn now to the post-
Miranda
 silence issue, which the appellate court raised, and which defendant echoes in support of the appellate court’s judgment. In its opinion, the appellate court suggested that Detective Beck’s testimonial comment on defendant’s post–
Miranda
 “silence,” in the face of Beck’s accusation of guilt, violated defendant’s right to a fair trial. There is no suggestion that the prosecutor commented on 
this
 aspect of Beck’s testimony.

At trial, Beck testified that he advised defendant of his rights prior to interviewing defendant, specifically informing defendant that he did not have to speak with Beck. Beck said defendant agreed to speak with him and “make a statement,” thus waiving his right to remain silent. After defendant attempted to offer an exculpatory explanation for his flight from pursuing police officers, they discussed the reason for defendant’s arrest, and Beck told defendant he knew defendant was involved in the armed robbery. Defendant immediately responded, but his response was not directed to Beck’s accusation. Defendant did not invoke his right to remain silent. He did not seek to terminate the interview. He did not ask to speak to an attorney. He did not invoke any of these rights, despite having been so recently admonished. Defendant responded evasively by ignoring the accusation and asking Beck what Beck could do for him if he cooperated. In other words, defendant continued speaking with Beck.

In a rather abbreviated argument, defendant suggests that Beck’s comment on defendant’s failure to deny his accusation of guilt constituted a violation of principles espoused in 
Doyle v. Ohio
, 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976). We believe this contention is questionable at best, which, perhaps, explains the appellate court’s failure to expand upon its suggestion of error.

The Supreme Court has held “a defendant who voluntarily speaks after receiving 
Miranda 
warnings has not been induced to remain silent.” 
Anderson v. Charles
, 447 U.S. 404, 408, 65 L. Ed. 2d 222, 226, 100 S. Ct. 2180, 2182 (1980). When a defendant waives his 
Miranda 
rights, and makes statements to police, “[a]s to the subject matter of his statements, the defendant has not remained silent at all.” 
Anderson
, 447 U.S. at 408, 65 L. Ed. 2d at 226, 100 S. Ct. at 2182.

Our research has revealed numerous cases that have sanctioned the admissibility of testimony regarding a defendant’s silence or nonverbal conduct during questioning subsequent to a valid waiver of rights. For example, it has been held in such a situation that a defendant’s failure to respond to 
some 
questions during questioning–while responding to others–may be the subject of testimony at defendant’s trial, at least where the defendant’s silence cannot be construed as an attempt to reassert his rights and cut off questioning altogether. See generally 
United States v. Burns
, 276 F.3d 439, 441-42 (8th Cir. 2002) (the court of appeals concluded that defendant’s “silent response” to one inquiry during the custodial interrogation, and eventual refusal to respond to further questioning, were “part of an otherwise admissible conversation” the use of which did not violate defendant’s due process rights); 
United States v. Davenport
, 929 F.2d 1169, 1174-75 (7th Cir. 1991) (similar holding; noncustodial interrogation); 
United States v. Robinson
, 956 F.2d 1388, 1398 (7th Cir. 1992) (after defendant was read 
Miranda 
rights and made two statements, he was told of another’s cooperation with the government; testimony was properly admitted that defendant “dropped his head and said, ‘Oh, forget it’ ”); 
United States v. Goldman
, 563 F.2d 501, 503-04 (1st Cir. 1977) (defendant’s failure to respond to a question in the course of the interrogation was not an assertion of his right to remain silent and evidence thereof was properly admitted); 
Burton v. Beck
, 320 F. Supp. 2d 582, 590 (E.D. Mich. 2004) (defendant’s mere refusal to answer or respond to a question, after having waived 
Miranda 
rights and answered questions, did not, without more, constitute an assertion or reassertion of the right to silence); 
Commonwealth v. Senior
, 433 Mass. 453, 462-64, 744 N.E.2d 614, 621-22 (2001); 
People v. Reavey
, 436 Mich. 197, 218-22, 462 N.W.2d 1, 10-12 (1990) (“The Fifth Amendment does not preclude substantive use of testimony concerning a defendant’s behavior and demeanor during a custodial interrogation after a valid waiver of his Fifth Amendment right against compelled self-incrimination. When a defendant speaks after receiving 
Miranda 
warnings, a momentary pause or even a failure to answer a question will not be construed as an affirmative invocation by the defendant of the right to remain silent”); 
Thomas v. State
, 726 So. 2d 357, 358 (Fla. App. 1999) (holding testimony that defendant had no response to question during police interview was not impermissible comment on his constitutional right to remain silent, where defendant had voluntarily waived his 
Miranda
 rights); 
Romano v. State
, 909 P.2d 92, 108 (Okla. App.1995) (where defendant waived his right to remain silent and participated in the interview, the officer properly testified that defendant refused to answer certain questions).

Some might well find the reasoning of these cases compelling. That reasoning was summed up by the Supreme Court of Massachusetts in 
Senior
:

“ ‘[A] defendant has not only the right to remain silent from the beginning but also a continuing right to cut off, at any time, any questioning that does take place.’ [Citation.] The defendant’s failure to answer one specific question ‘must be interpreted in the context of his willingness to talk both immediately prior to and subsequent to’ this particular question. [Citation.] The fact that the defendant was silent in response to the question concerning where he had been drinking did not constitute an affirmative indication ‘that he [was] invoking the right he previously waived.’ [Citations.] See 
Commonwealth v. Pennellatore
, 
supra
; 
Commonwealth v. Ewing
, 30 Mass. App. Ct. 285, 287 (1991) (defendant’s decision not to answer particular question did not constitute an indication that he was invoking previously waived right to remain silent). Indeed, for the rule of 
Miranda v. Arizona
, 384 U.S. 436 (1966), to apply, ‘there must be ... an 
expressed
 unwillingness to continue,’ which the defendant in this case did not manifest (emphasis added). [Citation.] As the judge found, the defendant could not ‘pick and choose,’ because ‘[i]f he talks, what he says or omits is to be judged on its merits or demerits, and not on some artificial standard that only the part that helps him can be later referred to. This was not a case where the government commented upon ... a prior exercise of rights. The government asked the jury to measure what the defendant [did not say] when he had no rights because he had voluntarily waived them.’ 
United States v. Goldman
, 563 F.2d 501, 503 (1st Cir.1977), cert. denied, 434 U.S. 1067 (1978), quoting 
Vitali v. United States
, 383 F.2d 121, 123 (1st Cir. 1967).” 
Senior
, 433 Mass. at 463, 744 N.E.2d at 621-22.

We note that the defendant in the case at bar continued speaking with Beck for a time after Beck’s accusation; he did not, 
at that point
, reassert his right to remain silent. 
Cf.
 
People v. Graham
, 206 Ill. 2d 465, 474-76 (2003) (defendant responded by saying he “didn’t want to talk,” and the interview was immediately terminated).

While there are certainly cases reaching a result contrary to those we have cited (see 
People v. Jennings
, 112 Cal. App. 4th 459, 5 Cal. Rptr. 3d 243 (2003) (rejecting the State’s argument that defendant’s silence, after she initially waived her 
Miranda
 rights, could be used against her unless she expressly reinvoked her right)), a strong argument could certainly made that 
this
 is the “scenario” to which the appellate court referred in 
People v. Powell
, 301 Ill. App. 3d 272, 277 (1998) (suggesting it is “possible–even if highly unlikely–that a scenario could arise in which a defendant’s tacit admission might be probative”). Moreover, we note in passing that it is arguable defendant was not silent at all. He in fact 
responded 
to Detective Beck’s accusation–albeit an evasive response–with a statement that we have already observed indicates consciousness of guilt, standing alone.

In any event, we need not decide whether defendant’s failure to deny Beck’s accusation is admissible against him, because the error, if any, is harmless beyond a reasonable doubt. See 
People v. Morgan
, 197 Ill. 2d 404, 442 (2001) (unnecessary to address merits of argument where error, if any, is harmless); 
People v. Hooper
, 172 Ill. 2d 64, 79-80 (1996) (same).

Doyle 
violations–assuming, 
arguendo
, this was one, as defendant claims–are subject to a harmless error analysis. 
People v. Dameron
, 196 Ill. 2d 156, 164 (2001). This court has recognized at least five factors for a court to consider in determining whether a 
Doyle 
violation is harmless beyond a reasonable doubt: (1) the party who elicited the testimony about defendant’s silence; (2) the intensity and frequency of the references to the defendant’s silence; (3) the use that the prosecution made of defendant’s silence; (4) the trial court’s opportunity to grant a mistrial motion or to give a curative jury instruction; and (5) the quantum of other evidence proving the defendant’s guilt. 
Dameron
, 196 Ill. 2d at 164.

In this case, the prosecution 
did
 elicit the testimony in question; however, that would appear to be the only factor that weighs against the State. As in the cases discussed in 
Dameron
, the reference in question was brief and isolated, and the prosecutor never revisited 
that 
aspect of the testimony. See 
Dameron
, 196 Ill. 2d at 164-65. Defense counsel did not object to the reference, so the reference was not highlighted. While this may have been a matter of trial strategy, or an acknowledgment that the testimony was proper, or mere ineptitude, depending upon one’s evaluation of the issue, it was defense counsel’s failure to object that deprived the court of the opportunity to consider whether error had occurred and take remedial action, if necessary. Finally, as to the last factor, the State presented a formidable case against defendant, albeit one based on circumstantial evidence.

According to the State’s evidence, defendant was observed not far from the scene of the robbery, driving in the opposite direction, in the early morning, within minutes of the robbery. The clothing he wore was identified as that worn by the robber. When the police followed him, and activated their lights, defendant accelerated and fled, leading them on a high-speed chase, at speeds between 50 and 70 miles per hour, through residential areas where the posted speed limit was 30 miles per hour. When defendant eventually lost control of his vehicle, and ran up into a yard, he got out of the car and tried to flee on foot. Moreover, he resisted when the officers caught him. Although there are some logical inferences that must be drawn to connect flight with guilt of the crime charged (
United States v. Blanco
, 392 F.3d 382, 395 (9th Cir. 2004)), and defendant attempted to offer an exculpatory explanation as to one of them (suggesting that he did not flee from officers because of the 
robbery
), we believe defendant’s flight and resistance upon apprehension constitute circumstances from which the trier of fact could infer consciousness of guilt. 
People v. McDonald
, 168 Ill. 2d 420, 448 (1995); 
People v. Peete
, 318 Ill. App. 3d 961, 966 (2001); 
United States v. Wright
, 392 F.3d 1269, 1277 (11th Cir. 2004) (“ ‘evidence of resistance to arrest and flight is admissible to demonstrate consciousness of guilt and thereby guilt’ ”), quoting 
United States v. Deparias
, 805 F.2d 1447, 1454 (11th Cir. 1986); 
United States v. Frazier
, 387 F.3d 1244, 1266 n.20 (11th Cir. 2004) (“harrowing flight from police–at speeds up to 100 miles per hour–was strong evidence of consciousness of guilt”).

When questioned by Beck, defendant suggested he might be willing to cooperate with Beck under appropriate circumstances, also evincing consciousness of guilt. See 
Levy
, 578 F.2d at 900.

Additionally, a significant amount of cash, in small bills, was found on the floorboard of defendant’s car, along with a pellet gun. A few bills were recovered from defendant’s person.

Moreover, defendant chose to testify and submit his version of events as evidence for the jury’s consideration. Defendant testified that, at 5:30 a.m. on the morning of the robbery, he was en route to his mother’s residence to feed her dogs. Having examined the city map that was admitted at trial, we can only say it seriously taxes reason for defendant to suggest that he took the circuitous route he did in order to get to his mother’s house. The nonsensical route he claims he drove actually took him 
away 
from his mother’s residence at one point, for no apparent reason, and doubled the distance otherwise required to get there. Defendant offered no explanation for the circuitous route he took. The route he testified to did, however, serve to place him in the vicinity where the officers first encountered him.

Defendant testified that he fled from police because he did not have a license, and he thought there might have been a warrant for his arrest with respect to some unspecified matter. He claimed he fled from two pursuing police cars because he wanted to reach an acquaintance’s house–so his car would not be towed when he was arrested. This explanation is highly implausible. Moreover, we would add that “fled” is probably the wrong word to use in describing defendant’s version of the police chase, as defendant testified that he (and by correlation the pursuing officers) never exceeded the speed limit, which the uncontradicted testimony indicated was 30 miles per hour. We need not expand upon the ludicrous imagery this calls to mind.

Finally, defendant suggested that the money recovered after his arrest represented the proceeds of his work cutting people’s hair. However, when pressed by the prosecutor on cross-examination, defendant could not recall the name of a single person whose hair he had cut.

The story defendant told the jury was simply unbelievable. If a defendant chooses to give an explanation for his incriminating situation, he should provide a reasonable story or be judged by its improbabilities. 
People v. Shevock
, 335 Ill. App. 3d 1031, 1037-38 (2003); 
People v. Nyberg
, 275 Ill. App. 3d 570, 579 (1995).

As in 
Dameron
, the testimony in question was brief and isolated, the State never returned to that aspect of the testimony, and there was strong evidence of guilt. See 
Dameron
, 196 Ill. 2d at 166. Assuming, 
arguendo
, there 
was 
a 
Doyle 
violation, we find it was harmless beyond a reasonable doubt.

We conclude there was no violation of Rule 402(f) or infringement of defendant’s right to a fair trial, and any 
Doyle 
violation was harmless beyond a reasonable doubt; therefore, we reverse the judgment of the appellate court and remand this matter to the appellate court for consideration of sentencing issues previously raised, but not addressed, in the appellate court.

Reversed and remanded.