2024 IL App (2d) 220439-U
No. 2-22-0439
Order filed February 27, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of De Kalb County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 03-CF-638 |
| ROBERT A. DALTON, | ) ) ) | Honorable Joseph C. Pedersen, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE MULLEN delivered the judgment of the court.
Justices Hutchinson and Kennedy concurred in the judgment.

**ORDER**

¶ 1    *Held*: (1) Defendant's postconviction claim of ineffectiveness of trial counsel was properly dismissed at the second stage because, even if counsel was deficient for failing to introduce a letter from the victim threatening to falsely accuse defendant of raping her, there was no reasonable probability that the jury would have found defendant not guilty of criminal sexual assault or child pornography. (2) Counsel on direct appeal was not ineffective for failing to argue that the trial court did not properly inquire into defendant's *pro se* allegations of ineffectiveness, as the court later remedied any procedural error.

¶ 2    Defendant, Robert A. Dalton, appeals from an order of the circuit court of De Kalb County granting the State's motion to dismiss his amended petition under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2018)). Defendant argues on appeal that his amended

petition made a substantial showing that his right to the effective assistance of trial and appellate counsel was violated. Defendant alternatively argues that he did not receive reasonable assistance from counsel in the postconviction proceedings. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4     Following a jury trial, defendant was found guilty of 10 counts of criminal sexual assault based on evidence that he committed acts of sexual penetration with the victim, M.C., in De Kalb County.[1] Some of the counts alleged that defendant was a family member of M.C., who was under age 18 (720 ILCS 5/12-13(a)(3) (West 2002)). The remaining counts alleged that defendant was over 17 and held a position of trust, authority, or supervision in relation to M.C., who was at least 13 but under 18 (*id.* § 12-13(a)(4)). Defendant was also found guilty of nine counts of child pornography (720 ILCS 5/11-20.1(a)(1), (a)(2) (West 2002)). The trial court entered judgments of conviction on five counts of criminal sexual assault and imposed a six-year prison term on each count, to be served consecutively. The trial court merged the remaining criminal sexual assault counts. The trial court also sentenced defendant to a four-year prison term for each count of child pornography, to be served concurrently with one another but consecutively to the sentences for criminal sexual assault. The trial court also imposed a $2000 fine.

_____

[1]Defendant was charged separately in case No. 03-CF-555 with sexual offenses against M.C. in LaSalle County. While the present case was pending, defendant was convicted of the LaSalle County offenses, and the trial court allowed the State to introduce evidence of the conduct underlying the LaSalle County convictions at defendant's trial on the De Kalb County offenses (see 725 ILCS 5/115–7.3 (West 2002)). The court also allowed the State to introduce the LaSalle County convictions for impeachment purposes.

¶ 5    At trial, M.C. testified that she was born on July 17, 1985. L.C. was M.C.'s mother. Defendant was L.C.'s boyfriend. M.C. first met defendant in August 1998 while living in Leland in LaSalle County. Defendant moved in with L.C., M.C., and M.C.'s younger brother, C.C. Defendant assumed the role of a father figure and an authority figure. In December 1999, defendant placed his hand underneath M.C.'s sweater and touched her breasts. That night, defendant told L.C. that he had accidentally touched M.C.'s breasts. M.C. testified that defendant convinced her and L.C. to sign "some sort of agreement that he wouldn't get in trouble" for "anything of a sexual nature towards [M.C.]" M.C. identified People's Exhibit No. 14 as the agreement, which was handwritten. The agreement purported to cover defendant's behavior during a certain date range. M.C. noted that the dates appeared to have been changed to cover the period from August 1, 1998, to August 1, 2003. M.C. testified that defendant placed his penis in her vagina on several occasions in 2000 and 2001.

¶ 6    In the spring or summer of 2002, L.C., M.C., C.C., and defendant moved together to Hinckley in De Kalb County. M.C. got a job at a McDonald's and bought a car for transportation. She financed the purchase in part with her savings. Defendant and L.C. took out a loan for the rest of the car's purchase price.

¶ 7    M.C. testified that defendant placed his penis in her vagina on October 7, 2002, and November 7, 2002. In December 2002, defendant took M.C. Christmas shopping and purchased lingerie for her. A few days later, while L.C. was at work, defendant asked M.C. to wear the lingerie. M.C. did not want to do so, but defendant told her that "it was either his way or the hard way," which M.C. perceived as a threat. M.C. put on the lingerie, and defendant had her pose while he took photographs with her i-Zone camera, which produced images on paper with an adhesive backing. She posed while on the bed and while standing. After defendant finished taking the

photographs, he forced M.C. to have sex with him in the room he shared with L.C. Asked to clarify what she meant by "sex," M.C. explained that defendant placed his penis in her vagina. M.C. identified People's Exhibit No. 2 as a picture frame with several photographs behind the backing. M.C. testified that the photographs were of her and accurately depicted how she looked in December 2002. The photographs variously showed M.C.'s naked breasts, vagina, and buttocks. M.C. testified that one of the photographs showed defendant penetrating her vagina from behind with his penis. Neither M.C.'s nor defendant's face is visible in the photograph. M.C. explained that she was face down on a comforter, and defendant took the photograph from behind. M.C. identified the items in People's Group Exhibit No. 4 as a matched set of lingerie, underwear, a bra, and knee-high stockings. She testified that she wore those items in some of the photographs. M.C. identified People's Exhibit No. 7 as other lingerie that she wore in some of the photographs.

¶ 8     M.C. identified People's Exhibit No. 3 as copies of the photographs from People's Exhibit No. 2. People's Exhibit No. 3 consists of two nearly identical collages of photographs. In the margins of each page is handwriting, which M.C. recognized as defendant's. Defendant had written: " '[M.C.]' 'Trailer Park Queen.' Who's a user and a lier [*sic*] so if you want to get used and abused you can see she will take it for all she can! Fat 'Ass.' 'Stretch Mark' Queen." Defendant also wrote, "Call xxx-xxx-xxxx. Ask for [M.C.] User + lier [*sic*] for hier [*sic*]!" The only apparent difference between the collages is the phone number. M.C. noted that one of the phone numbers was for an apartment where L.C., M.C., and C.C. resided after moving away from defendant.

¶ 9     M.C. testified that, on Valentine's Day in 2003, defendant placed his penis in her vagina. He did the same thing sometime in March 2003. In May 2003, M.C. told L.C. what defendant had been doing to her. L.C. was shocked. She said that they needed to leave, but they had no place to go. On M.C.'s eighteenth birthday, July 17, 2003, she got a tattoo on her lower back. At some

point in July 2003, L.C., M.C., and C.C. moved in with L.C.'s mother. In August 2003, they moved into an apartment in Batavia. Defendant moved into an apartment in a different building in the same complex. He harassed M.C. and L.C. In December 2003, M.C. spoke with the Leland chief of police.

¶ 10    On cross-examination, M.C. testified that she recalled telling police that defendant had only one testicle and had a V-shaped scar between his navel and his genitals. She never told them that he had a tattoo on his penis. She also testified that defendant had an X-shaped scar on his scrotum.

¶ 11    Michael Maloney, a tattoo artist, testified that, on July 17, 2003, he tattooed M.C.'s lower back. He viewed one of the photographs from People's Exhibit No. 2. According to Maloney, the photograph showed the part of M.C.'s body where the tattoo would have been placed, but the tattoo was not visible in the photograph.

¶ 12    Judith Ptak testified that she was a friend of M.C.'s mother and knew defendant. In December 2003, defendant came into the store where she worked and told her he was not dating L.C. anymore. Defendant told Ptak that he had started dating M.C. Defendant left briefly, returning with photographs of M.C. One photograph showed M.C. wearing a negligee. Because she did not want to look at any more of the photographs, Ptak did not know whether M.C. was naked in any of them.

¶ 13    Caryn Stechmuller testified that she resided in Springfield but had previously lived in Leland. She was acquainted with M.C., L.C., and defendant. Around Halloween in 2003, she saw defendant in the store where she worked. Defendant showed her photographs of M.C., who was wearing "little outfits" and had her "legs spread open." Defendant said that he had taken the photographs. When shown a group of photographs marked as People's Exhibit No. 24,

Stechmuller testified, "These are the porn pictures that I seen." (We note that People's Exhibit No. 24 is a collage of photographs that is identical to the collages in People's Exhibit No. 3 except that it has no handwriting.) Stechmuller clarified that she recognized only some of the photographs marked as People's Exhibit No. 24. She marked the three photographs that she recognized. The first photograph shows M.C.'s vagina, and the second shows her bare buttocks. The third shows her from behind, kneeling on a bed and wearing lingerie. Her back is mostly exposed, but no tattoo is visible. Defendant told Stechmuller that he was "seeing" M.C. During a subsequent encounter, defendant told Stechmuller that he had been "seeing" M.C. for a couple of years.

¶ 14   Jerry Koogler testified that he and defendant were neighbors in 2003. At some point between May and December of that year, defendant mentioned to Koogler that "there was a relationship between himself and his girlfriend's daughter."

¶ 15   L.C. testified that she met defendant in 1998 at their place of employment. Shortly after they met, defendant became homeless, moved into L.C.'s home in Leland, and they began dating. In 2002, she moved with her children and defendant to a house in Hinckley that she and defendant bought together. In May 2003, M.C. told L.C. that defendant "was making her kiss him and have sex with him." L.C. wanted to move out of the house, but she had no place to go at first. On July 18, 2003, she and her children moved out of the house and went to stay with her mother for two weeks. Later in July 2003, L.C. encountered defendant in the supermarket where she worked at the customer service desk. Defendant told her that he had left an envelope on the desk. L.C. found on the desk an envelope containing photographs of M.C. M.C. was wearing lingerie in some of the photographs and was naked in others. L.C. identified People's Exhibit No. 24 as the photographs in the envelope. L.C. could tell that M.C. was under 18 when the photographs were taken because she did not have the tattoo she got on her eighteenth birthday.

¶ 16    After leaving her mother's home, L.C. and her children moved into an apartment in Batavia. Defendant later moved into an apartment in the same complex and began to harass L.C.'s family. In November 2003, L.C. obtained an order of protection against defendant.

¶ 17    L.C. testified that defendant had tattoos on each arm but never had a tattoo on his penis while they were together. L.C. also testified that defendant had only one testicle. He told her that he lost the other in an accident when he was nine. L.C. noted that "[v]isually" it was difficult to tell that he was missing a testicle, because one side merely looked smaller than the other. Defendant "explained *** that the doctor said that that was tissue or growth." L.C. testified that her Hinckley telephone number was written on one of the photographs in People's Exhibit No. 3 and her Batavia phone number was written on another. Both phone numbers were in defendant's handwriting.

¶ 18    Officer Jason Swanson testified that, in December 2003, he investigated allegations that M.C. had been sexually assaulted. Swanson arrested defendant on December 30, 2003, and transported him to the Leland Police Department. While booking defendant, Swanson asked him whether he had any tattoos. Defendant mentioned that he had tattoos on his arm and shoulder. He did not indicate that he had a tattoo on his penis.

¶ 19    Swanson subsequently obtained a warrant to search a storage unit that defendant rented from a self-storage facility in Sugar Grove. During the search, Swanson seized a picture frame. Swanson removed the backing from the frame and discovered several photographs that appeared to be images of M.C. wearing "lingerie and in various states of undress." There was also a photograph of sexual penetration. Some photographs were attached to the picture frame's backing, while others were loose inside the frame. Swanson identified People's Exhibit No. 2 as the frame and some of the photographs found inside. Swanson also testified that the photographs in People's Exhibit No. 24 were "some of the *** same images that were in the picture frame just grouped

together in a collage." Swanson testified that he found People's Exhibit No. 24 "loose inside the picture frame." The collages in People's Exhibit No. 3 were also found in the picture frame. Swanson found the intimate apparel from People's Group Exhibit No. 4 inside a cooler in the storage unit.

¶ 20    Don Boldan testified for the defense that, in 1999, he taught a community college class in which defendant was enrolled. Boldan became aware that defendant had a tattoo on his penis. The tattoo was "a topic of discussion around the shop and snickers and jokes." Boldan admitted that he had never seen the tattoo.

¶ 21    Linda Sue Johnson-Laroche, a registered nurse employed by De Kalb County, examined defendant's genitalia on June 7, 2010. She observed a tattoo of a dollar sign on his penis. Defendant had a scar on the right side of his scrotum. He appeared to have two normal-sized testicles, but one was harder than a normal testicle and, in her opinion, was either an implant or diseased.

¶ 22    Dr. Liping Zhang testified that, on December 22, 2009, she treated defendant for a small laceration to his scrotum. The laceration was consistent with defendant's report that he was injured while pulling up his zipper. On cross-examination, Zhang testified that, in treating defendant, she learned that he had hernia surgery as a child. Hernia surgery would leave a scar on the lower abdomen above the scrotum. Dr. Zhang also indicated that she was familiar with a condition called a hydrocele, which is a pocket of fluid formed in the scrotum due to leakage from the abdomen. A hydrocele can be treated by draining the fluid through an incision in the scrotum.

¶ 23    Crystal Harrolle, an investigator for De Kalb County, testified that she took photographs of defendant's abdomen and penis on February 18, 2010. When she took the photographs, she observed that defendant had a tattoo of a dollar sign on his penis and that he appeared to have two testicles. She did not observe a V-shaped scar on defendant's abdomen.

¶ 24    The parties stipulated that defendant's mother would testify that defendant did not have surgery as a child to have a testicle removed, but he did have surgery at a young age for a hydrocele on his right testicle. The parties also stipulated that Dr. P. Ghosh examined defendant on December 28, 2006. During the examination, defendant reported that, at a young age, " 'he had surgery performed on his right testicle and a hernia repair.' "

¶ 25    Defendant testified that he lived with L.C. for financial reasons, namely to share rent. They did not develop a sexual relationship. Defendant did not consider himself a father figure to L.C.'s children and never disciplined them. L.C.'s children slept in one bedroom, and L.C. slept in another. Defendant slept on a couch in the family room. He never shared a bedroom with L.C. Defendant never placed his penis in M.C.'s vagina while they were living in Leland, and he never did so in Hinckley before M.C.'s eighteenth birthday. Defendant testified that he had two testicles and had been treated for a hydrocele as a child. In 1998, he got a tattoo of a dollar sign on his penis.

¶ 26    Defendant denied taking the photographs in People's Exhibit No. 2. Defendant also denied showing the photographs to anyone, including Ptak or Stechmuller. He testified that, when asked by Swanson about the photographs, he stated that he had never seen them before. Defendant reaffirmed that he had never seen the photographs before Swanson showed them to him. Defendant denied that he appeared in the photograph depicting sexual penetration. He noted, *inter alia*, that the photograph did not show his penis tattoo or the burn scar he had below his navel. Defendant denied telling Koogler that he was dating M.C.

¶ 27    Defendant testified that he first saw the picture frame in People's Exhibit No. 2 in the trunk of M.C.'s car. Defendant co-owned the car, and his name was on the "plate and titles." After L.C. and her children moved away from Hinckley, defendant became concerned that he was the only

one making payments on the loan on M.C.'s car. Defendant took possession of the car from a repair shop. In the car, he found the picture frame and some clothing, including lingerie. When defendant moved into an apartment in Batavia, he did not know that L.C. and her children were living in the same apartment complex.

¶ 28   Defendant testified that, in April 2002, he received a note from M.C. stating, "Bob I swear to you I really loved you. You told my mom on me and stabbed me in the back. I said to do things my way. I swear to God on my life you will be sorry."

¶ 29   On cross-examination, defendant reiterated that he did not have a sexual relationship with L.C. while they lived together. However, he admitted that he wrote a note stating, "[L.C.] 'said' Quote: I don't want a relationship or marriage. I just want a friend, sex, and a roommate. Well that's what she got." Defendant denied ever developing "feelings" toward M.C. However, he admitted that, in his card to her for her eighteenth birthday, he wrote, " 'Someone once asked me if I believe in miracles. I said you. The miracle in my life is you.' " Defendant admitted that he had sex with M.C. on her eighteenth birthday.

¶ 30   In rebuttal, the State introduced a certified copy of defendant's convictions of criminal sexual assault in LaSalle County in case No. 03-CF-555.

¶ 31   Swanson testified in rebuttal that he interviewed defendant at the LaSalle County Jail on January 13, 2004. Swanson showed defendant copies of the photographs in People's Exhibit No. 3, and defendant admitted that the photographs were his.

¶ 32   As noted, the jury found defendant guilty of multiple counts of child pornography and criminal sexual assault. Defendant subsequently filed a *pro se* "Petition for a New Attorney" in which he alleged that trial counsel had been ineffective. At the hearing on the motion, defendant argued that trial counsel had failed to introduce two letters from M.C. into evidence. The trial court

found that trial counsel was not ineffective and that there was no basis for appointment of new counsel.

¶ 33    As noted, the trial court sentenced defendant to an aggregate prison term of 34 years and imposed a $2000 fine. Defendant, by trial counsel, moved to reconsider his sentence. Defendant also filed several *pro se* motions accusing trial counsel of ineffective assistance, again for failing to introduce two letters from M.C. into evidence. The trial court appointed conflict counsel, who represented defendant at the hearing on the motions and argued that, due to trial counsel's ineffectiveness, defendant was entitled to a new trial.

¶ 34    The trial court denied the motions, and defendant appealed. Appellate counsel argued that (1) the trial court erred in permitting the State to impeach him with his LaSalle County convictions for criminal sexual assault of M.C. and (2) he was entitled to monetary credit toward his fine, based on time spent in custody. *People v. Dalton*, 2016 IL App (2d) 140632-U, ¶ 2. Counsel did not argue trial counsel's ineffectiveness regarding M.C.'s letters to defendant. We affirmed defendant's convictions but awarded him credit toward his fine. *Id.* ¶ 76.

¶ 35    Thereafter, defendant filed a *pro se* petition under the Act alleging, *inter alia*, that he received ineffective assistance from trial and appellate counsel. As in his posttrial motions, defendant alleged that trial counsel was ineffective because he failed to present evidence that M.C. wrote two letters to defendant that undermined the credibility of her testimony. In fact, as we have recounted, trial counsel questioned defendant about a letter in which M.C. wrote, "Bob I swear to you I really loved you. You told my mom on me and stabbed me in the back. I said to do things my way. I swear to God on my life you will be sorry." However, defendant attached to his petition a second letter, in which M.C. wrote in pertinent part,

"Bob you broke my heart and hurt me, when you called me a fat ass, a slob, and said I couldn't touch the dog, and that you didn't like me, or want to be around me and wanted me gone out of the house. I swear to God that you will be sorry if you leave me, my brother and mother here in Leland without any money. I will go to my family and everyone, and tell them how much of a [*sic*] ass your [*sic*] being. I'm not bullshitting. I will lie and tell them you hit me, cold cocked me, then even rapped [*sic*] me, then they will call the police and I will lie to them intentionally too."

The trial court appointed counsel for defendant and docketed the petition for further proceedings. Postconviction counsel filed an amended petition, which unqualifiedly adopted the *pro se* petition's allegations of ineffective assistance. The State moved to dismiss the petition. The trial court granted the motion, and this appeal followed.

¶ 36                                    II. ANALYSIS

¶ 37    The Act provides a mechanism by which a criminal defendant may obtain relief from a conviction resulting from a substantial violation of the defendant's constitutional rights. *People v. Ross*, 2022 IL App (2d) 210068, ¶ 15. As our supreme court has explained:

"Under the Act, a postconviction proceeding contains three stages. At the first stage, the [trial] court must independently review the postconviction petition, without input from the State, and determine whether it is 'frivolous or is patently without merit.' [Citation.] If the court makes this determination, the court must dismiss the petition in a written order. [Citation.] If the petition is not dismissed, the proceedings move to the second stage. [Citation.]

At the second stage, counsel is appointed to represent the defendant, if he is indigent [citation], and the State is permitted to file responsive pleadings [citation]. The [trial] court

must determine at this stage whether the petition and any accompanying documentation make a substantial showing of a constitutional violation. [Citation.] If no such showing is made, the petition is dismissed. If, however, the petition sets forth a substantial showing of a constitutional violation, it is advanced to the third stage, where the [trial] court conducts an evidentiary hearing [citation]." *People v. Johnson*, 2018 IL 122227, ¶¶ 14-15.

¶ 38 At issue is whether defendant made a substantial showing that either trial or appellate counsel provided ineffective assistance. Ineffectiveness claims are evaluated under the *Strickland* two-prong test. *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). *Strickland* requires a showing that counsel's performance "fell below an objective standard of reasonableness" and that the deficient performance was prejudicial in that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* This standard applies to both trial and appellate counsel. *People v. Randall*, 2021 IL App (1st) 191194, ¶ 66.

"If a defendant claims that appellate counsel was ineffective for failing to raise a claim of trial error, a defendant must show not only that appellate counsel's performance was deficient but also that there is a reasonable probability that the underlying claim of trial error would have succeeded on direct appeal." *Id.*

¶ 39 We first consider whether defendant made a substantial showing that trial counsel rendered ineffective assistance by failing to offer evidence that M.C. sent defendant a letter threatening to falsely accuse him of rape (defendant has abandoned his claim as to the letter in which M.C. said she had loved defendant and that he would be sorry for not doing things her way). Even assuming, *arguendo*, that counsel's failure to offer the evidence was deficient performance, there is no

reasonable probability that introducing the second letter from M.C. into evidence would have changed the outcome of the trial. Accordingly, defendant suffered no prejudice.

¶ 40     Although the letter might have had some impact on the jury's view of M.C.'s testimony, there was considerable evidence bolstering her testimony that defendant took pornographic photographs of her, including one where he was penetrating her. Notably, the photographs were found concealed in a picture frame discovered in defendant's storage unit, along with the intimate apparel M.C. wore in some of the photographs. Defendant testified that he had never seen the photographs, explaining that he found the picture frame in M.C.'s car and transferred it to the storage unit without looking behind the backing, where the photographs were concealed. However, Stechmuller testified that defendant told her he had taken the photographs in People's Exhibit No. 24 (which were copies of the photographs in People's ExhibitNos. 2 and 3). Furthermore, Swanson testified that defendant admitted the photographs in People's Exhibit No. 3 belonged to him. L.C. identified defendant's handwriting on the photographs in People's Exhibit No. 3. Moreover, on her eighteenth birthday, M.C. got a tattoo that would have been visible in some of the photographs if she were at least eighteen when they were taken. By far, the most reasonable inference from defendant's possession of these photographs is that defendant was the photographer and that the images he took included one showing him penetrating M.C. from behind. The photograph of defendant penetrating M.C. is, of course, proof of not only child pornography but also an instance of criminal sexual assault. Although there is no independent direct evidence corroborating M.C.'s account of the other incidents where defendant sexually assaulted her, it strains credulity to think that the jury would discredit her testimony about those incidents even if her letter to defendant had been admitted into evidence.

¶ 41   Additionally, significant aspects of defendant's exculpatory testimony were thoroughly impeached. For instance, despite living with L.C. and even buying a house with her, he denied that they were ever in a sexual relationship. However, he admitted writing a note stating that L.C. "want[ed] a friend, sex, and a roommate" and "that's what she got." More importantly, though defendant denied ever having feelings for M.C., he wrote in her birthday card that she was the " 'miracle' " in his life. In addition, he told Koogler that he was in a relationship with his girlfriend's daughter, and he told Stechmuller that he had been "seeing" M.C. for a couple of years. He showed Stechmuller photographs of M.C. wearing "little outfits" with her legs spread open.

¶ 42   Also, despite denying being in a relationship with L.C. or having feelings for M.C., defendant followed them from Hinckley to Batavia and moved into the same apartment complex where they lived. It is well established that, "[i]f a defendant chooses to give an explanation for his incriminating situation, he should provide a reasonable story or be judged by its improbabilities." *People v. Hart*, 214 Ill. 2d 490, 520 (2005).

¶ 43   Viewing all the evidence, there is no reasonable probability that the letter in which M.C. threatened to falsely accuse defendant of rape would have affected the outcome of the case. Accordingly, defendant's amended postconviction petition failed to make a substantial showing of a violation of defendant's right to the effective assistance of counsel.

¶ 44   Defendant next argues that he made a substantial showing that appellate counsel was ineffective for failing to argue on direct appeal that, in ruling on defendant's *pro se* posttrial motions alleging ineffective assistance of trial counsel, the trial court failed to follow the procedure outlined in *People v. Krankel*, 102 Ill. 2d 181 (1984), and its progeny. We note that defendant has failed to identify precisely where this claim was advanced in either the original or amended postconviction petition. We do not see the claim in either petition. "Any claim of substantial denial

of constitutional rights not raised in the original or an amended petition is waived." 725 ILCS 5/122-3 (West 2020). Even assuming the claim was properly raised, defendant failed to make a substantial showing of ineffective assistance of appellate counsel. An appellate argument that the trial court failed to comply with *Krankel* and its progeny would have been meritless, so defendant suffered no prejudice from appellate counsel's failure to raise such an argument.

¶ 45    In *People v. Moore*, 207 Ill. 2d 68, 77-79 (2003), our supreme court explained the *Krankel* procedure:

> "In [*Krankel*], the defendant's trial counsel failed to contact an alibi witness or to present an alibi defense at trial. The defendant raised a *pro se* posttrial challenge to his attorney's competence at trial. The parties agreed that the trial court should have appointed counsel, other than his originally appointed counsel, to represent [the] defendant at the posttrial hearing regarding his claim of ineffective assistance. This court remanded the matter for a new hearing on the defendant's motion with newly appointed counsel. [Citation.]

> In interpreting *Krankel*, the following rule developed. New counsel is not automatically required in every case in which a defendant presents a *pro se* posttrial motion alleging ineffective assistance of counsel. Rather, when a defendant presents a *pro se* posttrial claim of ineffective assistance of counsel, the trial court should first examine the factual basis of the defendant's claim. If the trial court determines that the claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel and may deny the *pro se* motion. However, if the allegations show possible neglect of the case, new counsel should be appointed. [Citations.] The new counsel would then represent the defendant at the hearing on the defendant's *pro se* claim of ineffective assistance.

[Citations.] The appointed counsel can independently evaluate the defendant's claim and would avoid the conflict of interest that trial counsel would experience if trial counsel had to justify his or her actions contrary to defendant's position. [Citations.]

The operative concern for the reviewing court is whether the trial court conducted an adequate inquiry into the defendant's *pro se* allegations of ineffective assistance of counsel. [Citation.] During this evaluation, some interchange between the trial court and trial counsel regarding the facts and circumstances surrounding the allegedly ineffective representation is permissible and usually necessary in assessing what further action, if any, is warranted on a defendant's claim. Trial counsel may simply answer questions and explain the facts and circumstances surrounding the defendant's allegations. [Citations.] A brief discussion between the trial court and the defendant may be sufficient. [Citations.] Also, the trial court can base its evaluation of the defendant's *pro se* allegations of ineffective assistance on its knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations on their face. [Citations.]"

¶ 46    In this case, the trial court conducted two separate hearings on *pro se* motions in which defendant claimed that trial counsel was ineffective. At the first hearing, the trial court found no basis for appointing new counsel to represent defendant. Defendant argues that the trial court failed to consider trial counsel's alleged ineffectiveness for failing to present the letter in which M.C. threatened to falsely accuse defendant of rape. Even assuming, *arguendo*, that the trial court should have appointed new counsel based on that claim, the error was clearly cured when defendant reiterated the claim in subsequent motions and the trial court appointed new counsel and held a hearing on the reasserted claim. Therefore, seeking appellate relief based on *Krankel* and its progeny would have been frivolous.

¶ 47 Defendant alternatively argues that, because postconviction counsel failed to allege with sufficient specificity that appellate counsel was ineffective for failing to raise a *Krankel* claim on direct appeal, he did not provide reasonable assistance. See, *e.g.*, *People v. Lezine*, 2023 IL App (2d) 220065, ¶ 19 (noting that the right to counsel in a postconviction proceeding is purely statutory and that the Act entitles the petitioner to the reasonable assistance of counsel). Having concluded that it would have been frivolous to raise a *Krankel* claim on direct appeal, we likewise conclude that it would be frivolous to predicate a postconviction claim of ineffective assistance on appellate counsel's failure to raise such a claim. Reasonable assistance does not require postconviction counsel to raise frivolous claims in an amended petition. *People v. Johnson*, 2018 IL App (5th) 140486, ¶ 25.

¶ 48                                    III. CONCLUSION

¶ 49 For the reasons stated, we affirm the judgment of the circuit court of De Kalb County.

¶ 50 Affirmed.